1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CHAMBER OF COMMERCE OF THE            No.  2:19-cv-02456-KJM-DB
     UNITED STATES OF AMERICA, et al.,
12
                Plaintiffs,
13                                          ORDER

14        v.

15   XAVIER BECERRA, in his official
     capacity as the Attorney General of the
16   State of California, et al.,

17              Defendants.

18

19            The Federal Arbitration Act ("FAA") provides that arbitration agreements are

20   "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

21   revocation of any contract."  9 U.S.C. § 2.  The U.S. Supreme Court has interpreted this provision

22   expansively, observing that it reflects "a liberal federal policy favoring arbitration agreements,

23   notwithstanding any state substantive or procedural policies to the contrary."  *Moses H. Cone*

24   *Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  This case raises the question

25   whether the FAA preempts a new law passed by the California Legislature and signed into law by

26   the Governor in late 2019.

27            Specifically, on October 10, 2019, California Governor Gavin Newsom signed into

28   law California Assembly Bill 51 ("AB 51"), which prohibits California employers from requiring

                                        1

1    prospective and current employees to "waive any right, forum, or procedure" for a violation of the

2    California Fair Employment and Housing Act ("FEHA") or the California Labor Code.  Cal. Lab.

3    Code § 432.6(a).  AB 51 was set to take effect January 1, 2020; however, on December 29, 2019,

4    this court temporarily restrained state officials from enforcing the law pending a full preliminary

5    injunction hearing.  Temporary Restraining Order ("TRO"), ECF No. 24.  In so doing, the court

6    explained that AB 51 "raise[s] serious questions regarding whether the challenged statute is

7    preempted by the [FAA] as construed by the United States Supreme Court."  *Id.* at 1.

8              On January 10, 2020, the court heard oral argument on plaintiffs' motion to

9    preliminarily enjoin AB 51 from taking effect.  Mot. for Prelim. Inj. ("MPI"), ECF No. 5.  During

10   argument, the defendants raised for the first time a question regarding the court's jurisdiction to

11   issue an injunction, and the court then allowed supplemental briefing on jurisdiction.  *See* Defs.'

12   Supp. Br., ECF No. 37; Pls.' Supp. Br., ECF No. 40.

13             Having carefully considered all of the parties' briefs, the arguments at hearing and

14   the applicable law, the court finds it has jurisdiction over this case and GRANTS plaintiffs'

15   motion for a preliminary injunction for the reasons set forth below.

16   I.       BACKGROUND

17            A.       Parties

18             The plaintiffs in this action are the Chamber of Commerce of the United States of

19   America ("U.S. Chamber"), California Chamber of Commerce ("CalChamber"), National Retail

20   Federation ("NRF"), California Retailers Association ("CRA"), National Association of Security

21   Companies ("NASCO"), Home Care Association of America ("HCAOA") and the California

22   Association for Health Services At Home ("CAHSAH").  Compl., ECF No. 1, at 1.

23             The U.S. Chamber "is the world's largest business federation, representing

24   approximately 300,000 direct members and indirectly representing an underlying membership of

25   more than three million U.S. businesses and professional organizations" across the United States.

26   *Id.* ¶ 16.  Many U.S. Chamber members are California businesses that require arbitration

27   agreements as a condition of employment or require those who wish to avoid arbitration to

28   affirmatively opt out.  *Id.*  The U.S. Chamber asserts standing in this matter because it "seeks to

1   vindicate its own interests as well as the interests of [its] members . . . ." *Id.*   The U.S. Chamber

2   alleges this action aligns with their mission, which is "to foster economic growth throughout the

3   country, including in California." *Id.*

4         The CalChamber is a not-for-profit organization, consisting of more than 14,000

5   California private sector employees, "that seeks to transform California's business landscape

6   through advocacy." *Id.* ¶ 17.   Its members rely on arbitration agreements as a condition of

7   employment or require their employees to affirmatively opt out of arbitration if they wish to do

8   so. *Id.*   The CalChamber asserts standing in this matter through the vindication of its interests

9   and the interests of its members and because this suit is "germane to [its] mission to foster

10  economic growth and a thriving business community in California." *Id.*

11        The NRF is the world's largest retail trade association consisting of discount and

12  department stores, home goods and specialty stores, grocers, wholesalers, chain restaurants and

13  internet retailers, with many of its members either headquartered or located in California.  *Id.*

14  ¶ 18.  The CRA "works on behalf of California's retail industry" and "is the only statewide trade

15  association representing all segments of the retail industry[.]" *Id.* ¶ 19.  NASCO is the largest

16  contract security association in the county and represents tens of thousands of "highly trained

17  security officers servicing the public and private sector" in California.  *Id.* ¶ 20.  HCAOA is the

18  leading trade association in the home care industry and "advocate[s] for its members, for

19  caregivers, and for seniors in California and across America." *Id.* ¶ 21.  Finally, "CAHSAH is a

20  California non-profit mutual benefit corporation whose mission is to promote quality home care

21  and enhance the effectiveness of its members." *Id.* ¶ 22.  Each of these remaining plaintiffs

22  asserts standing in this action on grounds that each respective organization seeks to vindicate its

23  interests and the interests of its members, as all rely on arbitration agreements as a condition of

24  employment and seek to protect and foster economic growth in California related to their field of

25  interest.

26        The defendants in this action are Xavier Becerra, Attorney General of California,

27  Lilia Garcia Brower, California Labor Commissioner, Julie A. Su, Secretary of the California

28

1  Labor and Workforce Development Agency, and Kevin Kish, Director of the California

2  Department of Fair Employment and Housing.  All are sued in their official capacity only.  *Id.*

3  ¶¶ 23–26.

4        B.      <u>Procedural History</u>

5        On December 9, 2019, plaintiffs filed a complaint asking the court to declare AB

6  51 preempted by the FAA, to preliminarily and permanently enjoin defendants from enforcing

7  AB 51 and to enter judgment in plaintiffs' favor and award plaintiffs' attorneys' fees and costs.

8  Compl. at 22 (prayer for relief).  That same day, plaintiffs also filed the motion for preliminary

9  injunction at issue here, seeking to preliminarily enjoin defendants from enforcing AB 51 pending

10  final determination of the merits of plaintiffs' claims.  *See generally* MPI.  In compliance with the

11  Local Rules of this court, plaintiffs noticed the motion for January 10, 2020.

12        One week later, on December 16, 2019, having not obtained defendants'

13  agreement to voluntarily refrain from enforcing AB 51 for even a short period of time, plaintiffs

14  moved the court to temporarily restrain AB 51 from taking effect on January 1, 2020, pending

15  resolution of the preliminary injunction motion.  *See* Mot. for TRO, ECF No. 8.  Defendants

16  opposed the TRO motion, ECF No. 14, and, on December 23, 2019, the court held a telephonic

17  hearing on that motion, ECF No. 22.  *See also* Dec. 23 Hr'g Tr., ECF No. 28.  On December 30,

18  2019, the court granted plaintiffs' motion for a temporary restraining order and found that despite

19  plaintiffs' delay in seeking immediate intervention, plaintiffs nonetheless had carried their burden

20  at this early stage of the litigation by raising serious questions going to the merits of the dispute

21  and showing the balance of hardship tipped in their favor.  TRO at 1.

22        On December 27, 2019, in accordance with the parties' stipulated briefing

23  schedule, defendants lodged their opposition to plaintiffs' motion for preliminary injunction.

24  Opp'n, ECF No. 23.  On January 3, 2020, plaintiffs replied.  Reply, ECF No. 29.

25        On January 10, 2020, the court heard oral argument on the motion.  Counsel

26  Donald Falk, Archis Parasharami and Bruce Sarchet appeared on behalf of plaintiffs; counsel

27  Chad Stegeman appeared on behalf of defendants.  The court submitted the matter and then

28

granted the motion by minute order issued on January 31, 2020.  *See* ECF No. 44.  This order

confirms the minute order, with explanation.

II.     FEDERAL ARBITRATION ACT ("FAA")

"The FAA was enacted in 1925 in response to widespread judicial hostility to

arbitration agreements."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  The

"primary substantive provision of the Act" is found in section 2.  *Id.* (quoting *Moses H. Cone*, 460

U.S. at 24).  That section provides:

> A written provision in any maritime transaction or a contract
> evidencing a transaction involving commerce to settle by arbitration
> a controversy thereafter arising out of such contract or transaction, or
> the refusal to perform the whole or any part thereof, or an agreement
> in writing to submit to arbitration an existing controversy arising out
> of such a contract, transaction, or refusal, shall be valid, irrevocable,
> and enforceable, save upon such grounds as exist at law or in equity
> for the revocation of any contract.

9 U.S.C. § 2.  The Supreme Court has "described this provision as reflecting both a liberal federal

policy favoring arbitration and the fundamental principle that arbitration is a matter of contract."

*Id.* (internal quotation marks and citations omitted); *see also Ferguson v. Corinthian Colleges,*

*Inc.*, 733 F.3d 928, 932 (9th Cir. 2013) ("[The FAA] reflects an 'emphatic federal policy' in favor

of arbitration." (quoting *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 533 (2012)).

III.    ASSEMBLY BILL 51

A.      Statutory Text

California Assembly Bill 51 aims to make two additions to California's statutory

scheme, section 12953 to the Government Code and section 432.6 to the Labor Code.  AB 51,

*Labor and Employment—Discrimination—Waiver*, 2019–2020 Reg. Sess. (Cal. 2019).  The

primary provisions of AB 51 appear in Labor Code section 432.6.  That statute, as set forth in the

bill, provides:

> (a) A person shall not, as a condition of employment, continued
> employment, or the receipt of any employment-related benefit,
> require any applicant for employment or any employee to waive any
> right, forum, or procedure for a violation of any provision of the
> California Fair Employment and Housing Act (Part 2.8 (commencing
> with Section 12900) of Division 3 of Title 2 of the Government
> Code) or this code, including the right to file and pursue a civil action

5

1
2

or a complaint with, or otherwise notify, any state agency, other public prosecutor, law enforcement agency, or any court or other governmental entity of any alleged violation.

3
4
5
6
7

(b) An employer shall not threaten, retaliate or discriminate against, or terminate any applicant for employment or any employee because of the refusal to consent to the waiver of any right, forum, or procedure for a violation of the California Fair Employment and Housing Act or this code, including the right to file and pursue a civil action or a complaint with, or otherwise notify, any state agency, other public prosecutor, law enforcement agency, or any court or other governmental entity of any alleged violation.

8
9

(c) For purposes of this section, an agreement that requires an employee to opt out of a waiver or take any affirmative action in order to preserve their rights is deemed a condition of employment.

10
11

(d) In addition to injunctive relief and any other remedies available, a court may award a prevailing plaintiff enforcing their rights under this section reasonable attorney's fees.

12
13
14
15

(e) This section does not apply to a person registered with a self-regulatory organization as defined by the Securities Exchange Act of 1934 (15 U.S.C. Sec. 78c) or regulations adopted under that act pertaining to any requirement of a self-regulatory organization that a person arbitrate disputes that arise between the person and their employer or any other person as specified by the rules of the self-regulatory organization.

16
17

(f) Nothing in this section is intended to invalidate a written arbitration agreement that is otherwise enforceable under the Federal Arbitration Act (9 U.S.C. Sec. 1 et seq.).

18

(g) This section does not apply to postdispute settlement agreements or negotiated severance agreements.

19
20

(h) This section applies to contracts for employment entered into, modified, or extended on or after January 1, 2020.

21
22

(i) The provisions of this section are severable. If any provision of this section or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

23

Cal. Lab. Code § 432.6.

24
25
26

The bill also adds Government Code section 12953, which reads: "It is an unlawful employment practice for an employer to violate Section 432.6 of the Labor Code."  Cal. Gov't Code § 12953.

27
28

6

1        Additionally, as pertinent here, existing Labor Code section 433 provides that

2 "[a]ny person violating this article is guilty of a misdemeanor."  Under other existing provisions

3 of the Labor Code, a misdemeanor offense is "punishable by imprisonment in a county jail, not

4 exceeding six months, or by a fine not exceeding one thousand dollars ($1,000), or both."  Cal.

5 Lab. Code § 23.

6      B.   Legislative History[1]

7        1.   Purpose

8        AB 51's stated purpose "is to ensure that individuals are not retaliated against for

9 refusing to consent to waive their rights and the procedures under FEHA and the Labor Code as

10 well as to ensure that any contract relating to those rights and procedures be executed as a matter

11 of voluntary consent."  Senate Floor Analysis, Third Reading ("S. Floor Analysis"), at 2–3.  The

12 bill's author states that AB 51 aims to address the issue of "[f]orced arbitration" because it "is

13 among the most harmful practices that have enabled widespread abuse to go undetected for

14 decades."  *Id.* at 3.  The author also takes the position that "[t]he real impact of forced arbitration

15 is not alternative dispute resolution, but claim suppression."  *Id.* at 4.

16        2.   Prior Legislative Attempts

17        In the years before AB 51's enactment, two prior assembly bills sought to address

18 the issues raised by employees subject to mandatory waivers of rights: AB 2617 (Weber, Ch. 910,

19 Stats. 2014) and AB 465 (Hernandez, 2016).  Senate Judiciary Committee Analysis ("S. Judiciary

20 Analysis") at 8.  AB 2617 prohibited a required waiver of rights under the Ralph Civil Rights Act,

---

[1] The court takes judicial notice of the various legislative materials related to AB 51 located on the Official California Legislative Information Website, as publicly available government documents whose contents cannot reasonably be questioned.  *See* Fed. R. Evid. 201 (governing judicial notice); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (taking judicial notice of information on government-administered website whose accuracy was undisputed); *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015)  ("Under Rule 201, the court can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet,' such as websites run by governmental agencies." (citation omitted and alteration in original)).  This information is located at: https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200AB51. The court cites to each legislative material by referencing its listing title and corresponding page number.

1    Cal. Civ. Code § 51.7, and the Tom Bane Civil Rights Act, Cal. Civ. Code § 52.1, while AB 465

2    proposed a similar law with respect to employee rights under the Labor Code.  *Id.*  Former

3    California Governor Jerry Brown vetoed AB 465 to allow courts to resolve then-pending FAA

4    preemption challenges to AB 2617, which the Governor said would ultimately affect the proposal

5    embodied in AB 465.  *Id.*

6           In *Saheli v. White Mem'l Med. Ctr.*, 21 Cal. App. 5th 308, 323, *review denied*

7    (2018), California's Second District Court of Appeal resolved the question this way: "The Ralph

8    Act and Bane Act, as amended by Assembly Bill 2617, unquestionably discriminate against

9    arbitration by placing special restrictions on waivers of judicial forums and procedures in

10   connection with claims brought under those acts."  The court found AB 2617's two key

11   provisions led to its demise because the bill made arbitration agreements presumptively

12   unenforceable unless the party seeking enforcement proves "(1) the other party knowingly and

13   voluntarily agreed to arbitration, and (2) the arbitration agreement was not made a condition of a

14   contract for goods or services or of providing or receiving goods or services."  *Id.*  These "special

15   requirements," the court explained, subjected the act to FAA preemption because they did "not

16   apply to contracts generally."  *Id.*

17          In 2018, the Legislature considered and passed AB 3080 (Gonzalez, 2018), a bill

18   that, "in many respects," is "identical" to AB 51.  S. Judiciary Analysis at 9.  Then-Governor

19   Brown vetoed this bill as well, comparing AB 3080 to the two prior bills, AB 465 and 2617, and

20   finding the bill violated the FAA as construed by the U.S. Supreme Court.  *Id.*  In his veto

21   message, Governor Brown explained:

22          This bill is based on a theory that the Act only governs the
             enforcement and not the initial formation of arbitration agreements
23          and therefore California is free to prevent mandatory arbitration
             agreements from being formed at the outset. The Supreme Court has
24          made it explicit this approach is impermissible. In 2017 Justice
             Kagan, an appointee of President Obama, writing on behalf of a near-
25          unanimous Supreme Court, clearly rejected the assertion that the
             Federal Arbitration Act has no application to contract formation
26          issues:

27          "By its terms, . . . the Act cares not only about the "enforce[ment]"
             of arbitration agreements, but also about their initial "valid[ity]"- that
28          is, about what it takes to enter into them. Or said otherwise: A rule

                                          8

1

2

3

selectively finding arbitration contracts invalid because improperly formed fares no better under the Act than a rule selectively refusing to enforce those agreements once properly made. Precedent confirms that point." *Kindred Nursing Centers Ltd. Partnership v. Clark*, 137 S. Ct. 1421, 1428 (2017).

4

Since this bill plainly violates federal law, I cannot sign this measure.

5

6

*Id.* at 8–9 (alterations in original).

7

8

9

10

11

12

13

14

15

16

AB 51's proponents believe their bill cures the infirmities of the prior legislation reviewed above and thus avoids FAA preemption.  As to AB 2167, proponents assert the two provisions the *Saheli* court found fatal to the law's survival—waiver unenforceability and an assignment of burden of proof—are absent from AB 51; therefore, they say, AB 51 avoids preemption on these grounds.  S. Judiciary Analysis at 9.  Regarding AB 3080, in response to Governor Brown's veto comments, proponents note that "AB 51 would not selectively invalidate arbitration contracts because improperly formed. . . .  AB 51 simply gives the worker the option of whether or not to form the contract in the first place." *Id.* at 10.  As for disparate treatment, they say, "nothing in AB 51 selectively calls out arbitration contracts as such; the bill applies to contracts requiring waiver of any forum." *Id.*

17

### 3.    Constitutional Preemption

18

19

20

21

22

23

24

25

26

27

28

Given AB 51's legislative genealogy, the potential for the bill to conflict with the FAA was addressed during the Legislature's consideration of the bill's provisions.  The Senate floor analysis expressly observed that "AB 51 seeks to sidestep the preemption issue by not prohibiting, discouraging, or restricting the use of arbitration agreements by employers or workers, but rather requiring applying prior case law that stressed the need for consent in arbitration agreements." S. Floor Analysis at 5.  Similarly, an Assembly analysis makes clear that consent is the animating force behind AB 51 as the basis for avoiding FAA preemption: "this bill would not frustrate the purpose of the FAA because that purpose follows the basic precept, emphasized numerous times by the Supreme Court, that arbitration 'is a matter of consent, not coercion.'"  Assembly Committee on Labor and Employment ("A. L&E Analysis") at 4 (citation omitted).  For these reasons, proponents of the bill believe "[i]t is a mischaracterization of AB 51

9

1    to say that it *prohibits* arbitration agreements," as the bill merely "sets ground rules to ensure that

2    such an agreement is truly voluntary."  S. Judiciary Analysis at 6 (emphasis in original).

3            Nonetheless, the legislative analyses of AB 51 presciently recognized that, given

4    the Supreme Court's jurisprudence on FAA preemption, "there is little doubt that, if enacted, [AB

5    51] would be challenged in court and there is some chance . . . that it would be found preempted."

6    *Id.* at 7.

7    IV.    LEGAL STANDARD

8            "A preliminary injunction is an extraordinary remedy never awarded as of right[,]"

9    *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should not be granted

10   unless the movant, by a clear showing, carries the burden of persuasion[,]"  *Lopez v. Brewer*, 680

11   F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)

12   (emphasis in original)).  In determining whether to issue a preliminary injunction, federal courts

13   must consider whether the moving party "[1] is likely to succeed on the merits, . . . [2] is likely to

14   suffer irreparable harm in the absence of preliminary relief, . . . [3] the balance of equities tips in

15   [the movant's] favor, and . . . [4] an injunction is in the public interest."  *Winter*, 555 U.S. at 20.

16           The Ninth Circuit has "also articulated an alternate formulation of the *Winter*

17   test[.]"  *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012).  That formulation is referred to as

18   the "serious questions" or the "sliding scale" approach: "'serious questions' going to the merits

19   and a balance of hardships that tips sharply towards the plaintiff can support issuance of a

20   preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable

21   injury and that the injunction is in the public interest."  *Alliance for the Wild Rockies v. Cottrell*,

22   632 F.3d 1127, 1135 (9th Cir. 2011) ("the 'serious questions' approach survives *Winter* when

23   applied as part of the four-element *Winter* test," *id.* at 1132).  "In other words, 'serious questions

24   going to the merits' and a hardship balance that tips sharply toward the plaintiff can support

25   issuance of an injunction, assuming the other two elements of the *Winter* test are also met."  *Id.* at

26   1132.  Under the "serious questions" approach to a preliminary injunction, "[t]he elements of the

27   preliminary injunction test must be balanced, so that a stronger showing of one element may

28   offset a weaker showing of another."  *Lopez*, 680 F.3d at 1072.

1          Moreover, in each case and irrespective of the approach to a preliminary

2  injunction, a court must balance the competing alleged harms while considering the effects on the

3  parties of the granting or withholding of the injunctive relief.  *Winter*, 555 U.S. at 24.  In

4  exercising that discretion, a court must also consider the public consequences of the extraordinary

5  remedy.  *Id.*

6  V.     <u>DISCUSSION</u>

7          The court first addresses jurisdiction and then, finding it has jurisdiction, proceeds

8  to explain why plaintiffs satisfy their burden under the *Winter* test to obtain the preliminary

9  injunctive relief they seek.

10        A.     <u>Jurisdiction</u>

11          Defendants challenge the court's jurisdiction on two grounds: subject matter

12  jurisdiction and standing.  Defs.' Supp. Br. at 2–9.  If either is lacking the court may not decide

13  this case, and must dismiss this matter for lack of jurisdiction.

14        1.     <u>Subject Matter Jurisdiction</u>

15          Regarding subject matter jurisdiction, defendants argue plaintiffs state no

16  cognizable claim because 42 U.S.C. § 1983, the federal statute under which plaintiffs assert their

17  preemption claim, requires violation of a federal right; because the Constitution's Supremacy

18  Clause confers no such right, the court lacks subject matter jurisdiction.  *Id.* at 2–5.  They also

19  argue the FAA does not create such a federal right.  *Id.*  Plaintiffs counter that 28 U.S.C. § 1331

20  undergirds federal jurisdiction given the court's power to grant equitable relief.  Pls.' Supp. Br. at

21  3–7.  Alternatively, plaintiffs argue the FAA confers rights cognizable under § 1983.  *Id.* at 7–9.

22          The court has subject matter jurisdiction under 28 U.S.C. § 1331.  As plaintiffs

23  correctly note, the Supreme Court effectively resolved the question of subject matter jurisdiction

24  over preemption claims in *Shaw v. Delta Air Lines, Inc*., when it held:

25               It is beyond dispute that federal courts have jurisdiction over suits to
                enjoin state officials from interfering with federal rights. *See Ex parte*

26               *Young*, 209 U.S. 123, 160–162, 28 S.Ct. 441, 454–455, 52 L.Ed. 714
                (1908). A plaintiff who seeks injunctive relief from state regulation,

27               on the ground that such regulation is pre-empted by a federal statute
                which, by virtue of the Supremacy Clause of the Constitution, must

28

prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.

463 U.S. 85, 96 n.14 (1983).  Circuit courts have consistently affirmed this principle in exercising jurisdiction over preemption challenges to state law.  *See Indep. Living Ctr. of S. California, Inc. v. Shewry*, 543 F.3d 1050, 1055 (9th Cir. 2008) ("The Supreme Court has repeatedly entertained claims for injunctive relief based on federal preemption, without requiring that the standards for bringing suit under § 1983 be met."); *see also Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 331 (5th Cir. 2005) ("It is well-established that the federal courts have jurisdiction under 28 U.S.C. § 1331 over a preemption claim seeking injunctive and declaratory relief."); *Qwest Corp. v. City of Santa Fe, New Mexico*, 380 F.3d 1258, 1264 (10th Cir. 2004) ("Relying on *Shaw* . . . , this court has concluded that federal district courts have jurisdiction over actions seeking to enjoin the enforcement of a state regulation."); *Local Union No. 12004, United Steelworkers Of Am. v. Massachusetts*, 377 F.3d 64, 74 (1st Cir. 2004) ("[A] claim of preemption . . . *does* constitute a federal question under § 1331." (emphasis in original)); *Illinois Ass'n of Mortg. Brokers v. Office of Banks & Real Estate*, 308 F.3d 762, 765 (7th Cir. 2002) (same); *St. Thomas–St. John Hotel & Tourism Ass'n, Inc. v. Govt. of the United States Virgin Islands*, 218 F.3d 232, 241 (3d Cir. 2000) (same).

Plaintiffs' first claim invokes the Supremacy Clause and makes clear their request for equitable and declaratory relief is predicated on the preemptive force of the FAA, relying on the court's power to act under § 1983. Compl. ¶¶ 97–104.  Their second claim, titled "Equitable Relief," appeals to the court sitting in equity and seeks the court's "exercise [of] its equitable power to enter an injunction precluding the Defendants from enforcing AB 51." *Id.* ¶ 109.  Their third claim seeks declaratory relief under the federal Declaratory Judgment Act, 28 U.S.C. § 2201. *Id.* ¶¶ 110-113.  Given the nature of plaintiffs' claims, the court has no doubt regarding its jurisdiction to resolve plaintiffs' preemption claims.  The Supreme Court's decision in *Shaw* makes clear that jurisdiction adheres.  In *Shaw*, the court considered claims by several large employers against the Acting Commissioner of the New York State Division of Human Rights, who argued the federal Employee Retirement Income Security Act ("ERISA") preempted New

12

1   York's human rights and disability benefits laws.  463 U.S. at 92.  Although ERISA provides no

2   express cause of action for employers seeking to challenge state benefit laws in federal court, "the

3   Court . . . reached the merits of the preemption claims anyway, holding that the state legislation

4   was preempted only insofar as it prohibited practices that were otherwise lawful under ERISA."

5   *Shewry*, 543 F.3d at 1056 (citing *Shaw*, 463 U.S. at 108–09).  In so doing, the Court "merely

6   reaffirmed the traditional rule that injunctive relief is presumptively available in federal court to

7   enjoin state officers from implementing a law allegedly preempted under the Supremacy Clause."

8   *Id.* at 1057.  Here, the court's equitable power is sufficient to establish jurisdiction over plaintiffs'

9   federal preemption claims.

10                  2.   Standing

11                  Defendants also argue plaintiffs lack standing because, as organizational plaintiffs,

12   they "have not demonstrated a credible threat of harm to their members or themselves that is

13   actual or imminent."  Defs.' Supp. Br. at 6.  Plaintiffs counter that under the organizational

14   standing test, they "need only show that a single *one* of their members would have standing to sue

15   in its own right," and plaintiffs have done so here.  Pls.' Supp. Br. at 9 (emphasis in original).

16   Here too plaintiffs are correct.

17                  Because defendants primarily challenge standing based on a lack of harm, there is

18   significant overlap between the discussion here and that set forth below regarding likelihood of

19   irreparable harm as applicable to the court's preliminary injunction analysis.  Because the

20   likelihood of irreparable harm analysis itself provides significant support for a finding of the kind

21   of harm required for standing, the court only briefly addresses standing here to the extent not

22   covered below.

23                  As noted, plaintiffs are various organizations representing the interests of their

24   members across a range of industry sectors.  *See* Compl. ¶¶ 16–22.  To sue on behalf of their

25   members, plaintiffs must meet the constitutional minimum of Article III standing by showing:

26   "(a) [their] members would otherwise have standing to sue in their own right; (b) the interests

27   [they] seek[] to protect are germane to the organization's purpose; and (c) neither the claim

28   asserted nor the relief requested requires the participation of individual members in the lawsuit."

13

1    *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Defendants'

2    challenge relies only on the first prong.  Defs.' Supp. Br. at 5–9; Pls.' Supp. Br. at 9.  "To have

3    standing in their own right, an association's members must have 'suffered an injury in fact,' that

4    injury must be 'fairly traceable to the challenged conduct of the defendant,' and the injury must

5    be 'likely to be redressed' by a decision in their favor."  *Airline Serv. Providers Ass'n v. Los*

6    *Angeles World Airports*, 873 F.3d 1074, 1078 (9th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*,

7    136 S. Ct. 1540, 1547, *as revised* (2016)).  In applying this prong, the court must "accept as true

8    all material allegations of the complaint and construe the complaint in favor of the complaining

9    party."  *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1039 (9th Cir. 2015) (internal

10   quotation marks and citation omitted).

11           The allegations in the complaint, construed in plaintiffs' favor as required, satisfy

12   Article III standing.  In listing the organizational parties, the complaint alleges members of each

13   organization enter into arbitration agreements or require affirmative opt-outs as a condition of

14   employment, and those members would be irreparably harmed if AB 51 goes into effect.  *See*

15   Compl. ¶¶ 16–22 (describing each plaintiff organization, its reliance on arbitration agreements

16   and the harm faced if AB 51 takes effect).  The complaint also alleges organization members

17   "intend to continue to enter into arbitration agreements with workers . . . in reliance on the FAA

18   and U.S. Supreme Court decisions interpreting that statute[,]" these members will "subject

19   themselves to investigations and enforcement actions" if they fail to comply with AB 51 while

20   relying on FAA protections, or, alternatively, may "choose to comply with AB 51 out of fear of

21   lawsuits and civil and criminal enforcement actions."  *Id.* ¶¶ 85–88.  If they ultimately choose to

22   forego utilizing arbitration agreements altogether, the organization members will be immediately

23   deprived of the benefits of arbitration and will incur immediate costs redrafting standard

24   employment agreements and employee manuals, along with additional ancillary expenses related

25   to the reformulation of employment practices.  *Id.* ¶¶ 88–90.  No matter which course of action

26   organization members choose, "AB 51 makes it more difficult for employers to access the

27   benefits of arbitration."  *Id.* ¶ 91.  These allegations of plaintiffs describe "far more than simply a

28   setback to the organization[s'] abstract social interests," they plead a "concrete and demonstrable

14

1    injury to the organization[s'] activities—with the consequent drain on the organization[s']

2    resources," particularly in light of the alleged deterrent effect it will have on members' ability to

3    freely enter into arbitration agreements without fear of consequence.  *Havens Realty Corp. v.*

4    *Coleman*, 455 U.S. 363, 379 (1982).

5             Plaintiffs need not establish at this point that each of their individual members

6    have capacity to sue in their own right in order to meet the constitutional minimum.  While such a

7    requirement would set up a virtually impossible logistical hurdle for organizations of significant

8    size, *see, e.g.*, Spencer Decl. ¶ 3, ECF No. 40-2 (U.S. Chamber represents approximately 300,000

9    direct members); Barrera Decl. ¶ 3, ECF No. 40-3 (CalChamber consists of more than 14,000

10   private-sector employers); Chalios Decl. ¶ 1, ECF No. 40-7 ("CAHSAH comprises and represents

11   hundreds of members located throughout the State."), such a requirement also would severely

12   impair an organization's ability to bring suit on its members' behalf.  There is no precedent for

13   setting up such a hurdle.  As the Ninth Circuit explained in *Nat'l Council of La Raza v. Cegavske*,

> 14   Where it is relatively clear, rather than merely speculative, that one
>      or more members have been or will be adversely affected by a
> 15   defendant's action, and where the defendant need not know the
>      identity of a particular member to understand and respond to an
> 16   organization's claim of injury, we see no purpose to be served by
>      requiring an organization to identify by name the member or
> 17   members injured.

18   800 F.3d at 1041.  The allegations in the complaint sufficiently plead that many, if not all,

19   members of the plaintiff organizations that routinely utilize arbitration agreements will face harm

20   if AB 51 takes effect.

21             Declarations attached to plaintiffs' supplemental briefing in response to

22   defendants' standing challenge bolster this conclusion.[2]  Specifically, plaintiffs provide the

23   _____

24   [2] On January 31, 2020, defendants lodged objections to certain portions of the declarations
     attached to plaintiffs' supplemental brief.  *See* ECF No. 43.  The objections are generally based
25   on hearsay, lack of personal knowledge and speculation.  *Id.* at 3–8.  Defendants do not contend
     the declarations are prejudicial because they are untimely.  The court overrules the objections
26   generally and relies on these declarations as (1) merely confirming its prior finding that standing
     exists, and (2) as providing basic information about each organization's operational focus and its
27   members' use of arbitration agreements.  The court gives weight to the declarations only to the
     extent they provide support for the broader proposition that each plaintiff organization and its
28   members are actively involved in the California employment market and generally engage in the

                                              15

1    declarations of Glenn Spencer, the U.S. Chamber's Senior Vice President of the Employment

2    Policy Division, Jennifer Barrera, the CalChamber's Executive Vice President, Stephanie Martz,

3    NRF's Chief Administrative Officer, Senior Vice President, and General Counsel, ECF No. 40-4,

4    Rachel Michelin, CRA's President and CEO, ECF No. 40-5, Steve Amitay, NASCO's Executive

5    Director, ECF No. 40-6, Dean Chalios, President and CEO of CAHSAH, and Vicki Hoak,

6    Executive Director of the HCAOA, ECF No. 40-8.  Plaintiffs also provide a supplemental

7    declaration from Brian Maas, ECF No. 40-1.  In aggregate, these declarations confirm

8    organizational standing exists here.

9            Each declarant avers that his or her respective organization advocates on behalf of

10   its members, generally California businesses, and that those members share a unified goal, utilize

11   arbitration agreements or opt-outs as a mandatory condition of employment, and will be subject to

12   AB 51's criminal and civil penalties if they continue to utilize mandatory arbitration agreements

13   or will face immediate and significant costs to avoid use of arbitration agreements altogether in

14   order to protect themselves from potential penalties.  For example, CalChamber Executive Vice

15   President Jennifer Barrera asserts her organization's 14,000 California private-sector employers

16   together employ more than one-forth of the private sector workforce in California.  Barrera Decl.

17   ¶ 3.  Her members "utilize employment arbitration agreements and believe that they will be

18   impacted if AB 51 goes into effect because they treat arbitration as one of many conditions of

19   employment."  *Id.* ¶ 5(a).  Her members express substantial concerns regarding the choice they

20   will face if AB 51 goes into effect: "whether to change their employment practices and form

21   employment agreements, or to risk the criminal and civil penalties imposed by AB 51 by

22   continuing to treat arbitration as a condition of employment."  *Id.* ¶ 5(c).  Other plaintiffs allege

23   similar harm.  *See, e.g.*, Spencer Decl. ¶¶ 5, 8 ("[M]embers make agreeing to arbitration one of

24   many conditions on the offer of employment . . . .  If AB 51 does not continue to be enjoined . . .

25   members . . . will incur unrecoverable costs to comply."); Martz Decl. ¶ 6 ("NRF members who

26   _____

27   practice of utilizing arbitration agreements.  The court notes plaintiffs have responded to
     defendants' objections; the response does not alter the court's conclusions summarized in this
28   footnote.

1  continue to impose their arbitration policies in California will face irreparable harm, including

2  imminent, credible threats of both criminal prosecution and civil penalties under the plain

3  language of AB 51."); Michelin Decl. ¶¶ 3, 5 ("CRA members regularly refuse to hire or

4  terminate employees who refuse to enter into arbitration agreements . . . . Absent further

5  injunctive relief against AB 51 . . . members who continue to impose their arbitration policies in

6  California will face irreparable harm.").  These declarations supplement the allegations in the

7  complaint and further support the court's conclusion that plaintiffs have met the constitutional

8  threshold to establish organizational standing.

9            B.    Likelihood of Success on the Merits

10            In resolving a preliminary injunction motion, "[t]he first factor under *Winter* is the

11  most important . . . [b]ecause . . . when a plaintiff has failed to show the likelihood of success on

12  the merits, [the court] need not consider the remaining three [*Winter* elements]."  *Garcia v.*

13  *Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (last alteration in original) (quotations marks and

14  citations omitted).

15            Plaintiffs contend they are likely to succeed on the merits of their preemption

16  claim for two reasons: (1) AB 51 violates § 2 of the FAA because it treats arbitration agreements

17  differently from other contracts, and (2) AB 51 conflicts with the purposes and objectives of the

18  FAA.  Reply at 1–6.  Defendants argue plaintiffs are unlikely to succeed on the merits because

19  AB 51 merely regulates employer behavior, not arbitration agreements.  Opp'n at 5–9.  As

20  explained below, the court finds plaintiffs satisfy their burden of showing AB 51 is likely

21  preempted by the FAA and thus they are likely to succeed on the merits of their claims.

22                  1.    Preemption Generally

23            The Supremacy Clause of the Constitution provides that "the Laws of the United

24  States . . . shall be the supreme Law of the Land[.]"  U.S. Const. art. VI, cl. 2.  "Under this

25  principle, Congress has the power to preempt state law."  *Arizona v. United States*, 567 U.S. 387,

26  399 (2012).  Typically, preemption takes one of three forms.  *See Nat'l Fed'n of the Blind v.*

27  *United Airlines Inc.*, 813 F.3d 718, 724 (9th Cir. 2016) (explaining doctrines of express, field and

28

1    conflict preemption).  However, as explained below, whether the FAA preempts a state law is

2    determined by considering discreet principles tailored to the FAA.

3                        2.      The FAA

4            As reviewed above, § 2 of the FAA expressly makes agreements to arbitrate 'valid,

5    irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

6    revocation of any contract." 9 U.S.C. § 2.  The Supreme Court has observed the FAA reflects

7    "both a 'liberal federal policy favoring arbitration,' . . . and the 'fundamental principle that

8    arbitration is a matter of contract.'"  *Concepcion*, 563 U.S. at 339 (citations omitted).  For this

9    reason, "courts must place arbitration agreements on an equal footing with other contracts . . . and

10   enforce them according to their terms."  *Id.* (citations omitted).  This "equal-footing," or "equal

11   treatment" principle reflects the notion that "the FAA is 'at bottom a policy guaranteeing the

12   enforcement of private contractual arrangements[.]"  *E.E.O.C. v. Waffle House, Inc.*, 534 U.S.

13   279, 294 (2002) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler—Plymouth, Inc.*, 473 U.S.

14   614, 625 (1985)).

15           In practical terms, equal treatment means "[a] court may invalidate an arbitration

16   agreement based on 'generally applicable contract defenses' like fraud or unconscionability, but

17   not on legal rules that 'apply only to arbitration or that derive their meaning from the fact that an

18   agreement to arbitrate is at issue.'"  *Kindred Nursing Centers Ltd. P'ship v. Clark*, 137 S. Ct.

19   1421, 1426 (2017) (quoting *Concepcion*, 563 U.S. at 339).  Therefore, if any state rule "singles

20   out arbitration," it is preempted by the FAA.  *Id.* at 1425.

21           A state law's disparate treatment of arbitration can occur not only on its face, *id.* at

22   1426 (citing *Concepcion*, 563 U.S. at 341), but also by "covertly . . . disfavoring contracts that

23   (oh so coincidentally) have the defining features of arbitration agreements," *id.*  The latter

24   scenario arises where a law "'rel[ies] on the uniqueness of an agreement to arbitrate as [its]

25   basis'—and thereby violates the FAA."  *Id.* (second alteration in original) (quoting *Concepcion*,

26   563 U.S. at 341).  This principle applies not only to the enforcement of arbitration agreements,

27   but also to their creation.  *Kindred*, 137 S. Ct. at 1428 ("By its terms, then, the Act cares not only

28

1    about the enforcement of arbitration agreements, but also about their initial validity—that is,

2    about what it takes to enter into them." (internal quotations and alternations omitted)).

3          Furthermore, even when a state law puts arbitration agreements on equal footing,

4    the law may nonetheless be subject to FAA preemption if it "interferes with fundamental

5    attributes of arbitration." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418 (2019).  This kind of

6    interference implicates conflict preemption principles because the state law, in essence, "stand[s]

7    as an obstacle to the Federal Arbitration Act." *Shroyer v. New Cingular Wireless Servs., Inc.*, 498

8    F.3d 976, 989 (9th Cir. 2007).

9          In sum, unequal footing and interference with the fundamental attributes of

10   arbitration are two ways in which a "state-law rule can be preempted by the FAA." *Blair v. Rent-*

11   *A-Ctr., Inc.*, 928 F.3d 819, 825 (9th Cir. 2019).

12                    3.    Unequal Footing

13         Plaintiffs contend they are likely to succeed on the merits of their claims because

14   AB 51 places arbitration agreements on unequal footing with other contracts.  Reply at 1.  In

15   opposition, defendants argue plaintiffs are unlikely to succeed on the merits because AB 51 does

16   not regulate agreements; it only regulates employer attempts to "coerce agreements waiving

17   employment and labor law rights."  Opp'n at 5.

18         Although plaintiffs overreach in arguing that AB 51 prevents employers from even

19   offering arbitration agreements to employees, *see, e.g.,* MPI at 14, on balance, plaintiffs have the

20   better argument here.  In pertinent part, AB 51 prohibits a person's requiring as a condition of

21   employment, the waiver of "any right, forum, or procedure" for a violation of the FEHA or the

22   Labor Code.  Cal. Lab. Code § 432.6(a).  A violation of this provision is subject to civil or

23   criminal penalties.  *See* Cal. Gov't Code § 12965; Cal. Lab. Code § 433.  Waivers of a "right,

24   forum, or procedure" include, even if they are not limited to, agreements to arbitrate instead of

25   litigate in court.  As AB 51's legislative history acknowledges, the primary target of the bill is

26   agreements to arbitrate.  S. Floor Analysis at 3–4.  As a result, AB 51 penalizes employers who

27   include, as a take-it-or-leave-it proposition, a mandatory arbitration clause that operates as a

28   "right, forum, or procedure" waiver in their employment contracts.  While defendants technically

19

1     are correct that AB 51 is written to proscribe a certain type of action by a "person" or "employer,"

2     Cal. Lab. Code § 432.6(a), (b), the proscribed action is primarily that of requiring an arbitration

3     clause as a condition of employment. The distinction defendants attempt to draw is one without a

4     difference relevant here.[3] In its expressed purpose, and its operation, AB 51 singles out the

5     requirement of entering into arbitration agreements and thus subjects these kind of agreements to

6     unequal treatment.

7             Defendants also argue that AB 51 merely codifies a central tenet of the FAA, that

8     "arbitration is strictly a matter of consent." Opp'n at 5–9 (alteration and quotation marks

9     omitted) (quoting *Lamps Plus*, 139 S. Ct. 1407 (2019)). They suggest the bill furthers the

10    principle of consent by "mitigat[ing] hiring policies that 'foist' waivers on employees." *Id.*

11    Consent is a tenet foundational to agreements covered by the FAA. In this respect, the concept of

12    consent and the equal-footing principle are entirely consistent. "Arbitration is a matter of

13    contract," *Concepcion*, 563 U.S. at 351, and the FAA "command[s] that arbitration agreements be

14    treated like all other contracts," *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 447

15    (2006). To the extent the California Legislature's goal in adopting AB 51 was to ensure

16    employment-related arbitration agreements are born of consent and free of coercive influence,

17    Opp'n at 6, that goal is consistent with the FAA. When the goal translates into a state-derived

18    rule affecting arbitration specifically, however, the rule runs afoul of the federal law by

19    contravening the equal footing principle.

20            As noted above, the equal-footing principle provides the foundation for

21    determining whether a state law discriminates against arbitration agreements in some way. In

22    *Kindred*, the Court found a Kentucky Supreme Court "clear-statement" rule preempted by the

23

24         [3] Defendants note that California has successfully enacted numerous laws that regulate
employer behavior, including with respect to waivers of certain employee rights. *See* Opp'n at 7–

25    8 (listing SB 358 (2015 Cal. Stats. Ch. 546 (S.B. 358)) (prohibiting retaliation for wage
discussion), SB 820 (2019 Cal. Stats. Ch. 953 (S.B. 820)) (prohibition on certain nondisclosure

26    agreements), SB 1300 (2019 Cal. Stats. Ch. 955 (S.B. 1300)) (prohibiting release of FEHA or
workplace claims absent certain requirements), AB 3109 (2019 Cal. Stats. Ch. 9949 (A.B. 3109))

27    (voiding contract provisions that prohibit party from testifying about criminal conduct or sexual
harassment)). These examples, however, are not laws that singled out contracts that bear the

28    defining features, either in name or effect, of arbitration agreements, as prohibited by the FAA.

1   FAA because it failed to "put arbitration agreements on an equal plane with other contracts." 137

2   S. Ct. at 1427.  The Kentucky rule, in essence, created an additional procedural safeguard before a

3   party's representative, an attorney-in-fact, could contractually waive that party's right to resolve a

4   dispute in court.  *Id.*  But the Court struck the rule down, saying this is "exactly what *Concepcion*

5   barred: adopt[ing] a legal rule hinging on the primary characteristic of an arbitration agreement—

6   namely, a waiver of the right to go to court and receive a jury trial." *Id.*  Such a rule, "tailor-made

7   to arbitration agreements," violates the equal footing principle and is incompatible with the FAA.

8   *Id.*  Similarly, in *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 683 (1996), the Court struck

9   down a Montana law as preempted by the FAA because it required that any contract subject to

10  arbitration provide notice, prominently displayed on the first page of the contract at issue.  This

11  "first-page notice requirement" was antithetical to FAA objectives because it "place[d] arbitration

12  agreements in a class apart from 'any contract,' and singularly limits their validity." *Id.* at 688.

13  The Court reiterated that "[a] state-law principle that takes its meaning precisely from the fact that

14  a contract to arbitrate is at issue does not comport with [the text of § 2]." *Id.* at 685 (alteration in

15  original) (quoting *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)).

16          It is AB 51's embodiment of a "legal rule hinging on the primary characteristic of

17  an arbitration agreement," *Kindred*, 137 S. Ct. at 1427, and placing "arbitration agreements in a

18  class apart from 'any contract,'" *Casarotto*, 517 U.S. at 688, that is the law's fatal flaw.  AB 51's

19  prohibition on California employers' use of "right, forum, or procedure" waivers as a condition of

20  employment, Cal. Lab. Code § 432.6(a), "oh so coincidentally" disfavors contracts with the

21  "defining features" of arbitration.  *Kindred*, 137 S. Ct. at 1426.  As in *Kindred*, defendants'

22  attempt here to paint AB 51 in broader terms is unavailing.  Defendants, again, argue AB 51 does

23  not single out arbitration agreements; "[r]ather, for both arbitration and other types of

24  employment agreements, it simply provides that employees cannot be forced to waive the rights

25  and protections afforded them under the law."  Opp'n at 7 (quotation omitted).  "But what other

26  rights, really," as the Court in *Kindred* asked, is AB 51 designed to target?  *Kindred*, 137 S. Ct. at

27  1427.  When pressed at hearing on this question, defendants responded that AB 51 applies equally

28  to employment terms such as non-disclosure agreements, forum selection clauses, choice-of-law

21

1    provisions and administrative exhaustion requirements.  Jan. 10 Hr'g Tr. at 6:8–21, ECF No. 36.

2    In response, plaintiffs argued that envisioning possible alternative applications cannot save an

3    otherwise unlawfully crafted statute designed to inhibit arbitration agreements in particular.  *Id.* at

4    6:24–8:17.  Plaintiffs are correct.  Other types of employment provisions may tangentially fall

5    within AB 51's ambit, but the law's clear target is arbitration agreements, given the sponsors'

6    concern regarding an overabundance of arbitration agreements in the California employment

7    market.  *See* S. Floor Analysis at 2–3 ("67.4% of all California employers mandate arbitration of

8    employment disputes" (emphasis omitted)).  Indeed, the very purpose of the bill is to "address[]

9    negotiations between employers and employees . . . over what forums and procedures will be

10   available to them in the event that the employee later alleges a violation of either the employee's

11   workplace civil rights or the Labor Code."  S. Judiciary Analysis at 4.  As one bill analysis

12   reported, "proponents of th[e] bill hope [it] . . . will reduce the number of California workers who

13   are forced into arbitration against their will."  *Id.*; *see also* S. Floor Analysis at 1 (summarizing

14   bill as "prohibit[ing] applicants for employment or employees to waive their right to a judicial

15   forum as a condition of employment . . . .").  As noted above, even if the law itself is artfully

16   crafted to support the argument that it only regulates the behavior of employers, it cannot avoid

17   being construed as law that in effect discriminates against arbitration agreements.

18           Defendants' counter to this conclusion makes an additional point: they point out

19   that AB 51 "does not render invalid any arbitration agreement that would otherwise be

20   enforceable under the FAA . . . ."  Opp'n at 5; *see also* Cal. Lab. Code § 432.6(f) ("Nothing in

21   this section is intended to invalidate a written arbitration agreement that is otherwise enforceable

22   under the Federal Arbitration Act.").  In other words, "even where the employer violates AB 51"

23   by, for example, requiring an employee to accept a mandatory arbitration clause, if and when the

24   arbitration agreement is formed it is fully enforceable.  *Id.*  It is the employer alone who may face

25   the civil or criminal sanctions available for violating the law.  But because the employer may be

26   sanctioned specifically for requiring an arbitration agreement as a condition of employment, with

27   a likely deterrent effect on the use of such agreements, *see Preston v. Ferrer*, 552 U.S. 346, 358

28

                                                    22

1  (2008), AB 51's design does not comport with the equal footing principle and its effort to avoid

2  FAA preemption fails.

3          The court finds, therefore, that AB 51 is preempted by the FAA because it singles

4  out arbitration by placing uncommon barriers on employers who require contractual waivers of

5  dispute resolution options that bear the defining features of arbitration.

6                  4.      Interference with Arbitration

7          AB 51 also interferes with the FAA's goal as interpreted by the Supreme Court

8  and is subject to preemption on this basis as well.  *Blair*, 928 F.3d at 828 ("'[A] doctrine normally

9  thought to be generally applicable' is nonetheless preempted by the FAA if it 'stand[s] as an

10  obstacle to the accomplishment of the FAA's objectives.'" (alterations in original) (quoting

11  *Concepcion*, 563 U.S. at 341, 343)).

12          Plaintiffs argue AB 51 conflicts with the purposes and objectives of the FAA

13  because it will, among other things, "forcefully impede the FAA's purpose 'to promote

14  arbitration'" by sanctioning employer behavior attendant to formation of legally permissible

15  arbitration agreements.  Reply at 6 (quoting *Concepcion*, 563 U.S. at 346).  Defendants contend

16  AB 51 does not inhibit the FAA's objectives because the bill only regulates employer behavior

17  "prior to entry into any agreement" and it respects the FAA's objectives by ensuring "that any

18  waiver of rights and remedies in the employment context is consensual."  Opp'n at 6.  Defendants

19  also note AB 51 does not invalidate otherwise enforceable arbitration agreements through the

20  creation of a new contract defense, *id.* at 5, thus respecting that "Congress plainly . . . intend[ed]

21  to preempt . . . only those [state contract defenses] that 'interfere[ ] with arbitration.'"  *Blair*, 928

22  F.3d at 828 (alterations in original) (quoting *Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d

23  425, 434 (9th Cir. 2015)).

24          The Supreme Court has declared as a bedrock principle "that the FAA was

25  designed to promote arbitration," as it reflects a "national policy favoring arbitration."

26  *Concepcion*, 563 U.S. at 345–46.  Any law, therefore, that "stands as an obstacle to the

27  accomplishment and execution of the full purposes and objectives of Congress . . . is pre-empted

28  by the FAA."  *Id.* at 352 (citations omitted).  As noted above, AB 51 will likely have a deterrent

                                              23

1   effect on employers' use of arbitration agreements given the civil and criminal sanctions

2   associated with violating the law.  While AB 51 did not create new civil sanctions, existing

3   Government Code sections provide for such sanctions.  *See, e.g.*, Cal. Gov't Code § 12953

4   (declaring Labor Code section 432.6 a violation under the FEHA); *id.* §§ 12963.7, 12965

5   (providing enforcement procedures for FEHA Director to follow and private right-to-sue options

6   attendant thereto).  While AB 51 did not create a new criminal sanction, existing Labor Code

7   section 433 provides that "[a]ny person violating this article is guilty of a misdemeanor," with

8   exposure to up to six months' imprisonment or a fine up to $1,000, *id.* § 23.  "This article"

9   referenced in section 433 includes the new Labor Code section included in AB 51, section 432.6.

10   Plaintiffs represent that the exposure to penalties will cause uncertainty in hiring market such that

11   employers are likely to alter their employment contacts to exclude arbitration agreements.  *See*

12   Maas Decl. ¶ 17[4] ("Because what a court will view as 'voluntary' is especially uncertain in the

13   context where an employer presents an agreement to its employees . . . [employers will]

14   consider[] the risk of criminal and civil liability too high . . . to safely rely on the voluntariness of

15   the process."); *see also* Spencer Decl. ¶ 8 ("[M]embers of the Chamber . . . will either have to

16   make changes to their contracting practices . . . or they will face criminal and civil penalties if

17   they do not eliminate arbitration as a requirement of the employment relationship."); Barrera

18   Decl. ¶ 5(c) ("[M]embers also expressed substantial concerns about the choices they would have

19   to make if AB 51 goes into effect, such as . . . risk [of] criminal and civil penalties."); Martz Decl.

20   ¶ 8 ("NRF . . . has further been compelled to spend time and resources counseling its members on

21   the harms threatened by AB 51.").

22          As noted above, while AB 51 includes a provision that "[n]othing in this section is

23   intended to invalidate a written arbitration agreement that is otherwise enforceable under the

---

24          [4] Defendants' move to strike portions of Mr. Maas's testimony for lack of foundation,
25   speculation, improper opinion, false and misleading statements and because they fail to meet
     fundamental evidentiary standards of admissibility.  *See* Obj. to Maas Decl., ECF No. 15.
26   Defendants' motion covers paragraphs 7, 26–28, 32–35 and 37 of the declaration.  *See generally*
     *id.*  Because the court relies only on paragraph 17 of the Maas declaration here, and not the
27   paragraphs identified in defendants' motion, it need not reach the merits of defendants' motion
     here.  The court addresses defendants' evidentiary objections below.
28

1    [FAA]," Cal. Lab. Code § 432.6(f), the provision does not exonerate employers who require the

2    agreement in the first place.

3              Given the penalties imposed on employers found to violate AB 51, the court finds

4    that the law also interferes with the FAA and for this reason as well is preempted.

5              5.    Conclusion

6              For the reasons discussed above, plaintiffs meet their burden of showing they are

7    likely to succeed on the merits of their claim that AB 51 is preempted by the FAA because it

8    discriminates against arbitration and interferes with the FAA's objectives.

9         C.    Likelihood of Irreparable Harm in the Absence of Preliminary Relief

10             Plaintiffs must also show that absent a preliminary injunction they are likely to

11   suffer irreparable harm, for even a showing of possible harm is "too lenient." *Winter*, 555 U.S. at

12   22.  To meet this burden, plaintiffs submit the declaration of Brian Maas, President of the

13   California New Car Dealers Association ("CNCDA").  Although the question of irreparable harm

14   does not hinge on the wholesale admissibility of Mr. Maas's declaration, the court must

15   nonetheless address certain of defendants' objections to the declaration before proceeding to

16   evaluate irreparable harm.

17             1.    Objections to Maas Declaration

18             Defendants object to paragraphs 7, 26–28, 32–35 and 37 of Mr. Maas's

19   declaration.  The court addresses the objections to paragraphs 27, 34 and 35, as these are the only

20   paragraphs challenged that are relevant to the court's findings below.

21             Because defendants' objections to paragraphs 27, 34 and 35 largely overlap, the

22   court's analysis applies to each of these paragraphs unless otherwise indicated.  In paragraph 27,

23   Mr. Maas avers that if AB 51 goes into effect, the CNCDA and its members will face immediate

24   and irreparable harm because they will be deprived of the benefits of predispute arbitration

25   agreements and the attendant cost savings.  Maas Decl. ¶ 27.  In paragraph 34, Maas testifies that

26   the harms imposed by AB 51 cannot be remedied by later damages awards because sunken costs

27   from redrafting employment agreements, abandoning arbitration and product cost reallocation

28   cannot be recovered.  *Id.* ¶ 34.  And, in paragraph 35, Maas states that cost increases associated

1 with otherwise arbitrable disputes are likewise also unrecoverable as those disputes would have

2 been diverted into the judicial system by the time this case concludes.  *Id.* ¶ 35.

3 Defendants object to paragraph 27 under Federal Rule of Evidence 403 as false,

4 misleading, deceptive and confusing.  Obj. to Maas Decl. at 4.  They also argue under Rule of

5 Evidence 602 that Maas's statements in all three paragraphs are speculative, lack foundation and

6 lack personal knowledge.  *Id.* at 4–6.  Finally, defendants argue Maas offers improper expert

7 testimony under Rule 701 and 702.  *Id.*  These objections are overruled.

8 As to defendants' Rule 403 objections to paragraph 27, that rule provides "[t]he

9 court may exclude relevant evidence if its probative value is substantially outweighed by a danger

10 of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ."  Fed. R. Evid. 403.

11 Mr. Maas's declaration directly supports plaintiffs' contention that AB 51 hinders arbitration

12 agreements through the imposition of criminal and civil penalties.  These statements are relevant

13 and speak directly to the plaintiffs' primary arguments supporting preemption.  Sustaining the

14 objections would require the court to accept defendants' proposition that AB 51 in no way hinders

15 or deprives employers from utilizing arbitration agreements.  *See* Obj. to Maas Decl. at 4.  For the

16 same reasons discussed above with respect to defendants' motion to strike, *see* Likelihood of

17 Success on the Merits, *supra*, the court declines to so rule.  The probative value of Mr. Maas's

18 statements at paragraph 27 are not substantially outweighed by the danger of unfair prejudice,

19 confusing the issues or their potential to mislead.

20 Likewise, Mr. Maas's statements in paragraphs 27, 34 and 35 should not be

21 excluded under Rule 602.  Testimony is admissible under Rule 602 "only if evidence is

22 introduced sufficient to support a finding that the witness has personal knowledge of the matter."

23 Fed. R. Evid. 602.  A witness's own testimony can provide the evidence necessary to establish

24 personal knowledge.  *Id.*  Defendants argue it is speculative whether CNCDA or its members

25 will experience an immediate and irreparable increase in the costs of dispute resolution.  Obj. to

26 Maas Decl. at 4.  But, as plaintiffs highlight, the unchallenged portions of Maas's declaration aver

27 that CNCDA members will avoid using arbitration agreements due to uncertainty and fear of

28 criminal and civil penalties.  Opp'n to Def.'s Obj. to Maas Decl., ECF No. 19, at 2 (citing Maas

1    Decl. ¶¶ 16–18, 29–30).  Given his position, Mr. Maas is competent to say that avoiding

2    arbitration will immediately deprive CNCDA members of cost and efficiency benefits.

3    Moreover, his observation informed by his professional role is consistent with generalized

4    propositions regarding arbitration articulated by the Supreme Court.  *Concepcion*, 563 U.S. at 344

5    ("The point of affording parties discretion in designing arbitration processes is to allow for

6    efficient, streamlined procedures tailored to the type of dispute."); *14 Penn Plaza LLC v. Pyett*,

7    556 U.S. 247, 257 (2009) ("Parties generally favor arbitration precisely because of the economics

8    of dispute resolution."); *see also Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 405

9    (2d Cir. 2009) ("[T]he twin goals of arbitration . . . [are] settling disputes efficiently and avoiding

10   long and expensive litigation." (citation omitted)).

11              Plaintiffs provide sufficient foundation for Mr. Maas's statements, as he has

12   personal knowledge of the value of arbitration agreements within his organization and the auto-

13   dealer industry; he represents a professional association that routinely counsels its members

14   regarding the use and benefit of arbitration agreements and provides form and standalone

15   agreements for members' use.  Maas Decl. ¶¶ 1–12.  Defendants' Rule 602 objections to

16   paragraphs 27, 34 and 35 are overruled except that to the extent paragraph 35 includes an

17   assertion that disputes are resolved more equitably in arbitration than in alternative forums, the

18   court does not rely on this assertion.

19              Finally, defendants move to strike these portions of Maas's declaration as

20   improper expert testimony of a non-expert under Rule of Evidence 701 and 702.  Under Rule 701,

21   non-expert opinion testimony is admissible if "rationally based on the witness's perception;

22   helpful to clearly understand[] the witness's testimony . . . [and] not based on scientific, technical,

23   or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  Plaintiffs do

24   not designate Mr. Maas as an expert under Federal Rule of Civil Procedure 26, *see* Fed. R. Civ. P.

25   26(a)(2); therefore, his testimony must meet the requirements of Rule 701 to be admissible.  In

26   this regard, the advisory committee notes to the 2000 amendments to the rules of evidence are

27   instructive:

28

> [M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. *See, e.g.*, *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

Fed. R. Evid. 701, adv. comm. note to 2000 amendment; *see also Pet Food Exp. Ltd. v. Royal Canin USA, Inc.*, No. C-09-1483 EMC, 2011 WL 6140874, at \*11 (N.D. Cal. Dec. 8, 2011) (collecting cases illustrating various ways courts have applied "business owners" exception under Rule 701).

Given this guidance, the court finds that Mr. Maas's statements qualify as lay opinion testimony under Rule of Evidence 701. Mr. Maas does not testify as an expert on the use of arbitration agreements in the marketplace broadly or purport to predict what widescale impact AB 51 will have on all California businesses; rather, he testifies that, based on his knowledge and experience as CNCDA president, its members rely on CNCDA's advice and counsel regarding arbitration agreements, the form and standalone agreements CNCDA provides, and regularly incorporate those agreements into their employment contracts as conditions of employment. As CNCDA president, Mr. Maas is aware of the benefits arbitration provides its members and has a basis for believing that if AB 51 goes into effect, its members will cease using arbitration agreements for fear of incurring criminal or civil penalties. All of Mr. Maas's positions are derived from his personal knowledge as CNCDA president, his interaction with its members and his understanding of its daily operations, and not from a position as a neutral expert on the benefits of arbitration more broadly. In other words, the particularized knowledge Mr. Maas conveys derives from his position within CNCDA. Moreover, defendants object only to portions of Mr. Maas's testimony, whereas other portions cover some of the same ground. *Compare, e.g.*, Maas Decl. ¶¶ 16–18, 22–24 (uncontested statements explaining AB 51's effect on CNCDA members), *with id.* ¶¶ 26–28 (contested statements regarding AB 51's impact on CNCDA

1   members' ability to rely on arbitration).  For these reasons, Mr. Maas's testimony is not excluded

2   as improper expert testimony under Rule 702.

3            The court overrules defendants' objections to paragraphs 27, 34 and 35 of Mr.

4   Maas's declaration and finds those paragraphs admissible for purposes of the present motion.

5                            2.      Irreparable Harm

6            The court turns now to the merits of plaintiffs' contention they will be irreparably

7   harmed absent a grant of injunctive relief.  Plaintiffs argue they will suffer irreparable harm

8   because AB 51 will cause immediate disruption in the employment market for the many

9   California employers who rely on arbitration as a mechanism to "anticipate lower legal costs and

10   more efficient dispute resolution procedures."  MPI at 13.  Plaintiffs argue the imminent harm

11   will materialize in one of two ways.  First, if employers choose not to comply with AB 51, they

12   risk criminal prosecution and civil enforcement action.  *Id.* at 13–14.  Second, if "coerced into

13   compliance" for fear of penalties, California businesses will inevitably "forego their federally

14   protected rights to enter into predispute arbitration agreements," which will cause them to incur

15   immediate administrative costs in order to redraft standard contracts, deprive them of the fiscal

16   benefit of arbitration, subject them to costly litigation, and increase meritless claims against them

17   with the hope of settlements, all without the ability to recoup costs.  *Id.* at 14–16.  In support of

18   these assertions, plaintiffs rely on Mr. Maas's declaration as CNCDA president.

19            In opposition, defendants argue plaintiffs do not, and cannot, show a likelihood of

20   irreparable harm because their assertions are overstated and ignore practical alternatives to

21   outright avoidance of entering into arbitration agreements.  Opp'n at 10.  Defendants' contentions

22   are based, primarily, on their objections to Mr. Maas's declaration, which the court has overruled

23   above.  *Id.*

24            The court finds plaintiffs meet their burden of showing a likelihood of irreparable

25   harm.  "Irreparable harm is traditionally defined as harm for which there is no adequate legal

26   remedy, such as an award of damages."  *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053,

27   1068 (9th Cir. 2014).  If AB 51 takes effect, plaintiffs have provided sufficient evidence to show

28   California businesses that rely on arbitration agreements as a condition of employment will be

1    forced to choose between risking criminal or civil penalties, or both, based on the uncertainties

2    surrounding AB 51's implementation, and foregoing the use of arbitration agreements altogether

3    to avoid penalties.  *See* Reply at 7–9; Maas Decl. ¶¶ 16–17, 23–24, 29–30.  California business

4    that rely on standard form arbitration agreements as a condition of employment will incur

5    immediate costs of redrafting their employment agreements to omit arbitration provisions and be

6    unable to realize the cost and efficiency benefits they say arbitration provides.  *See* MPI at 14–15;

7    Reply at 8–9; Maas Decl. ¶¶ 20–25, 27.  These costs likely cannot be recouped through traditional

8    legal remedies, such as damages, because the State of California, the moving force behind AB

9    51's enactment, is immune from suit under sovereign immunity, as are the defendant state actors

10   acting within their lawful capacity.  *See* MPI at 16 (citing *Odebrech Const., Inc. v. Sec'y, Fla.*

11   *Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013)); *see also Chamber of Commerce of U.S.*

12   *v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010) ("Imposition of monetary damages that

13   cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury.").

14   Defendants do not dispute that sovereign immunity will bar later recovery.  *See generally* Opp'n.

15   The costs California businesses will incur are not merely conjectural; they are highly probable

16   and not recoverable if AB 51 is found preempted by the FAA at the conclusion of the case.

17          The irreparable harm California employers will face if AB 51 is allowed to take

18   effect is akin to the harm identified in the case of *American Trucking Associations, Inc. v. City of*

19   *Los Angeles*, 559 F.3d 1046 (9th Cir. 2009).  In *American Trucking*, the Ninth Circuit considered

20   a lower court's refusal to enter a preliminary injunction on behalf of American Trucking

21   Associations, Inc. ("ATA"), a non-profit national trade association for the trucking industry that

22   sought to enjoin implementation of mandatory concession agreements for drayage trucking

23   services at the Ports of Los Angeles and Long Beach.  The ATA sought to enjoin the agreements'

24   implementation because the agreements were, ATA argued, preempted by the Federal Aviation

25   Administration Authorization Act ("FAAA Act").  *Id.* at 1048.  In finding likely preemption by

26   the FAAA Act, the Circuit also reviewed the lower court's finding that ATA could not show a

27   likelihood of irreparable harm.  The Circuit described the harm created by the concession

28   agreements as "a kind of Hobson's choice."  *Id.* at 1057.  If plaintiff motor carriers signed the

1   concession agreements, they would suffer monetary harm in the form of maintenance and

2   administrative expenditures necessary to comply with those agreements. *Id.*; *see also Am.*

3   *Trucking Associations, Inc. v. City of Los Angeles ("Am. Trucking I")*, 577 F. Supp. 2d 1110,

4   1126 (C.D. Cal. 2008) (lower court decision describing monetary costs in greater detail), *rev'd*,

5   559 F.3d 1046 (9th Cir. 2009).  If, however, the motor carriers did not sign the agreements, they

6   faced non-economic harm in the form of potential lost business and diminished goodwill. *Id.*;

7   *Am. Trucking I*, 577 F. Supp. 2d at 1126.

8           The Circuit found that no matter the choice, motor carriers would be subjected to

9   imminent harm. *Id.* at 1058.  First, if a carrier signed a concession agreement, "it will have been

10  forced to sign an agreement to conditions which are likely unconstitutional because they are

11  preempted," and "forced to incur large costs which . . . will disrupt and change the whole nature

12  of its business in ways that most likely cannot be compensated with damages alone." *Id.*  The

13  impact of such costs on smaller companies "would likely be fatal." *Id.*  Second, for carriers who

14  chose not to sign "the likely unconstitutional Concession agreements," the potential loss of

15  goodwill was hardly speculative because carriers would be foreclosed from accessing a

16  customer's goods at the ports, which would lead to diminished customer satisfaction and loss of

17  business. *Id.*

18          Here, the circumstances are sufficiently analogous to those in *American Trucking*

19  to warrant a finding of irreparable harm.  Plaintiffs have shown that if California employers

20  continue to rely on the mandatory arbitration agreements they have reasonably understood were

21  allowable under the FAA as construed by the Supreme Court, they face the risk of potential

22  criminal and civil penalties if they are found to have violated the new law.  Maas Decl. ¶ 17

23  ("Because what a court will view as 'voluntary' is especially uncertain . . . where an employer

24  presents an agreement to its employees, CNDCA considers the risk of criminal and civil liability

25  too high for members to safely rely on the voluntariness of the process.").

26          Alternatively, employers are likely to be deterred from proposing arbitration

27  agreements altogether, in a scenario that is factually inverse to that in *American Trucking*, but

28  yielding the same constitutionally invasive results.  In *American Trucking*, carriers choosing to

31

1    sign the concession agreements would have been forced to sign agreements, "which are likely

2    unconstitutional because they are preempted." *Am. Trucking*, 559 F.3d at 1058.  Here, employers

3    will be deterred from participating in contractual behavior governed by the FAA and likely

4    protected under the Supremacy Clause.  *Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d

5    865, 882 (9th Cir. 2008), *rev'd and remanded on other grounds*, 562 U.S. 134 (2011) ("Unlike

6    monetary injuries, constitutional violations cannot be adequately remedied through damages and

7    therefore generally constitute irreparable harm.").  While the Maas Declaration covers one

8    business sector, defendants do not argue that sector is an outlier and not representative of other

9    businesses.  It is not speculation to conclude that AB 51's deterrent effect will be widely felt.

10                    3.    Conclusion

11                   No matter the choice—continue to utilize arbitration agreements and risk criminal

12   and civil sanctions or avoid arbitration agreements for fear of non-compliance with a statute that

13   is likely preempted—the result is the same: California employers are faced with likely irreparable

14   harm.  Plaintiffs, therefore, satisfy their burden under this prong of the *Winter* test.

15            D.    Balance of Equities and Public Interest

16                   The remaining *Winter* factors also favor injunctive relief.  The balance of equities

17   and public interest factors merge when the government is the opposing party.  *Nken v. Holder*,

18   556 U.S. 418, 435 (2009).  "In assessing whether the plaintiffs have met this burden, the district

19   court has a duty to balance the interests of all parties and weigh the damage to each."  *Stormans,*

20   *Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (internal quotation marks and alternation

21   omitted).

22                   Without question the state has significant interests in advancing policies seeking to

23   protect its citizens' rights through legislative action.  Those interests are not unbounded, however.

24   The Ninth Circuit has observed "it would not be equitable or in the public's interest to allow the

25   state to continue to violate . . . federal law, especially when there are no adequate remedies

26   available to compensate [plaintiffs] for the irreparable harm that would be caused by the

27   continuing violation.  In such circumstances, the interest of preserving the Supremacy Clause is

28   paramount."  *California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852–53 (9th Cir.

2009), *vacated and remanded on other grounds sub nom. Douglas v. Indep. Living Ctr. of S. California, Inc.*, 565 U.S. 606 (2012); *see also Am. Trucking*, 559 F.3d at 1059–60 (recognizing that while concession agreements advance public interest in protecting ports, that interest cannot outweigh congressional intent nor the supremacy of federal law); *Nat'l Ass'n of Wheat Growers v. Zeise*, 309 F. Supp. 3d 842, 854 (E.D. Cal. 2018) ("California 'has no legitimate interest in enforcing an unconstitutional' law." (quoting *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006)).

On balance, the equitable and public interest factors here weigh in favor of preliminary injunctive relief.  Plaintiffs have satisfied their burden of showing AB 51 is incompatible with the FAA and they are likely to suffer irreparable harm if it takes effect.  The likelihood of this harm outweighs defendants' interest in advancing a policy seeking to enhance employee rights with respect to mandatory arbitration because defendants do so at the expense of arbitration rights governed by the FAA.  *See Maxwell-Jolly*, 563 F.3d at 852–53.  In the unlikely event AB 51 is later found compatible with the FAA and not preempted, defendants will have suffered the minimal harm of delayed enforcement, whereas plaintiffs are likely to have suffered harm that cannot be remedied.  As the Ninth Circuit has stressed, "it is always in the public interest to prevent the violation of a party's constitutional rights."  *Am. Beverage Ass'n v. City & Cty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (internal quotation marks and citation omitted).  All of these factors favor the granting of a preliminary injunction.

E.    Conclusion

In sum, plaintiffs satisfy each of the four factors under the *Winter* test to justify preliminary injunctive relief.  As a result, the Ninth Circuit's sliding scale approach is also satisfied.  Plaintiffs' motion for a preliminary injunction is GRANTED.

VI.    SEVERABILITY

The question remains whether preemption applies to some or all of AB 51's provisions.  Section 432.6(i) provides, "If any provision of this section or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application."  Cal. Lab. Code § 432.6(i).  Defendants argue an

1   injunction based on FAA preemption "would have to focus on the statute's application in

2   particular instances."  Defs.' Supp. Br. at 9.  Alternatively, defendants assert that if the court finds

3   sections 432.6(a) and (c) enjoined in their entirety, section (b) is "completely independent . . . and

4   would be enforceable along with the remainder of the statute.'  *Id.* at 10.  Plaintiffs agree that an

5   injunction should apply "only with respect to arbitration agreements governed by the FAA."  Pls.'

6   Supp. Br. at 13.  The only point of disagreement then is the extent to which an injunction should

7   encompass section (b).

8          Section 432.6(b) provides:

9          An employer shall not threaten, retaliate or discriminate against, or
           terminate any applicant for employment or any employee because of
10         the refusal to consent to the waiver of any right, forum, or procedure
           for a violation of the California Fair Employment and Housing Act
11         or this code, including the right to file and pursue a civil action or a
           complaint with, or otherwise notify, any state agency, other public
12         prosecutor, law enforcement agency, or any court or other
           governmental entity of any alleged violation.
13

14   Cal. Lab. Code § 432.6(b).  Plaintiffs argue section (b) has the same practical effect on arbitration

15   as the preempted components of section (a); therefore, section (b) should not be spared from the

16   FAA's preemptive hold.  Defendants aver section (b) stands independently from sections (a) and

17   (c); thus, preemption does not apply.

18          The court finds the preemptive effect of the FAA applies equally to provisions (a),

19   (b) and (c) of section 432.6.  While section (a) targets, as far as the FAA is concerned, conditional

20   use of arbitration agreements, section (b) focuses on what actions an employer may take when an

21   applicant or employee refuses to sign a right, forum or procedural waiver.  As plaintiffs correctly

22   highlight, the practical effect of this provision is that employers will be prohibited from

23   responding in any way to an applicant or employee that refuses to sign a waiver. This prohibition

24   is incompatible with the remainder of section (a) once FAA preemption is applied.

25          To illustrate, the parties agree preemption is limited to arbitration agreements

26   governed by the FAA.  *See* Pls.' Supp. Br. at 13; Defs.' Supp. Br. at 9–11.  Therefore, given

27   preemption, under section (a) an employer can, as a condition of employment, require an

28   applicant or employee to enter into mandatory arbitration agreements.  *See* Cal. Lab. Code

1    § 432.6(a).  However, if preemption does not then apply to section (b), an employer would be

2    prohibited from refusing to hire a prospective employee, or terminate an existing employee, if

3    that employee refused to sign the mandatory arbitration agreement.  In other words, if preemption

4    does not apply to section (b), conditional arbitration agreements will not be conditional at all, as

5    employers will lose the ability to act on an employee's refusal to abide by the requirement of

6    entering into an agreement.

7            For this reason the court finds FAA preemption applies equally to subsections

8    432.6(a), (b) and (c).

9    VII.    CONCLUDING OBSERVATIONS

10           Notwithstanding its expansive interpretation of the FAA, the Supreme Court has

11   observed that states are not foreclosed from crafting rules of general applicability.  *Kindred* notes,

12   137 S. Ct. at 1428 n.2.  When asked at hearing what kind of statute would pass muster, assuming

13   the legitimacy of the Legislature's policy concerns, plaintiffs' counsel offered that a generalized

14   statute could be permissible: "If a state wants to change the law of contract . . . , [] as long as they

15   apply to the making . . . and formation of contracts, generally, the state's at liberty to do that."

16   Jan. 10 Hr'g Tr. at 20:3–7.  For example, the state might clarify that each and every provision of

17   an employment contract must be consented to voluntarily.  Until such a proposal or another

18   generalized contract formation bill is attempted and tested, this suggestion may offer one path to a

19   rule of general applicability that is not foreclosed.

20           In the meantime, as noted above, section 2 of the FAA makes arbitration

21   agreements enforceable "save upon such grounds as exist at law or in equity for the revocation of

22   any contract."  9 U.S.C. § 2.  "[T]his saving clause permits agreements to arbitrate to be

23   invalidated by 'generally applicable contract defenses, such as fraud, duress, or

24   unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning

25   from the fact that an agreement to arbitrate is at issue." *Concepcion*, 563 U.S. at 339 (quoting

26   *Casarotto*, 517 U.S. 681, 687 (1996)).  Given the federal statute's provisions, the assertion of

27   standard contract defenses is a tool the court, on the current record and given binding precedent,

28   must assume remains available to those who seek to challenge arbitration agreements, after those

1    agreements are made.  In passing AB 51, the court notes, the Legislature did not rely on any data

2    or analyses suggesting that the standard contract defenses are not available as a practical matter to

3    employees who believe they have been coerced or misled into entering into arbitration

4    agreements.

5    VIII.    <u>CONCLUSION</u>

6             For the reasons set forth above, plaintiffs' motion for preliminary injunction, ECF

7    No. 5, is GRANTED, confirming the court's minute order entered on January 31, 2020:

8             1.       Defendant Xavier Becerra, in his official capacity as the Attorney General

9                      of the State of California, Lilia Garcia Brower, in her official capacity as the Labor

10                     Commissioner of the State of California, Julia A. Su, in her official capacity as the

11                     Secretary of the California Labor and Workforce Development Agency, and Kevin

12                     Kish, in his official capacity as Director of the California Department of Fair

13                     Employment and Housing are:

14                     a)       Enjoined from enforcing sections 432.6(a), (b), and (c) of the

15                              California Labor Code where the alleged "waiver of any right, forum, or

16                              procedure" is the entry into an arbitration agreement covered by the

17                              Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"); and

18                     b)       Enjoined from enforcing section 12953 of the California

19                              Government Code where the alleged violation of "Section 432.6 of the

20                              Labor Code" is entering into an arbitration agreement covered by the FAA.

21            2.       There is no realistic likelihood of harm to defendants from preliminarily

22                     enjoining enforcement of AB 51, so no security bond is required.

23            IT IS SO ORDERED.

24   DATED:  February 6, 2020.

25

26                                            CHIEF UNITED STATES DISTRICT JUDGE

27

28

36