**FILED**

**Sep 15, 2021**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA;
CALIFORNIA CHAMBER OF
COMMERCE; NATIONAL RETAIL
FEDERATION; CALIFORNIA
RETAILERS ASSOCIATION; NATIONAL
ASSOCIATION OF SECURITY
COMPANIES; HOME CARE
ASSOCIATION OF AMERICA;
CALIFORNIA ASSOCIATION FOR
HEALTH SERVICES AT HOME,
            *Plaintiffs-Appellees*,

v.

ROB BONTA[*], in his official capacity
as the Attorney General of the State
of California; LILIA GARCIA-
BROWER, in her official capacity as
the Labor Commissioner of the State
of California; JULIE A. SU, in her
official capacity as the Secretary of
the California Labor and Workforce
Development Agency; KEVIN
RICHARD KISH, in his official

No. 20-15291

D.C. No.
2:19-cv-02456-
KJM-DB

OPINION

---

[*] Rob Bonta has been substituted for his predecessor, Xavier
Becerra, as California Attorney General under Fed. R. App. P 43(c)(2).

capacity as Director of the California
Department of Fair Employment and
Housing of the State of California,
                    *Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, Chief District Judge, Presiding

Argued and Submitted December 7, 2020
San Francisco, California

Filed September 15, 2021

Before:  Carlos F. Lucero,[**] William A. Fletcher, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Lucero;
Dissent by Judge Ikuta

---

[**] The Honorable Carlos F. Lucero, United States Circuit Judge for
the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

## SUMMARY***

---

### Federal Arbitration Act / Preemption

The panel reversed, in part, the district court's conclusion that California Assembly Bill 51 is preempted by the Federal Arbitration Act; affirmed the district court's determination that the civil and criminal penalties associated with AB 51 were preempted; vacated the district court's preliminary injunction enjoining AB 51's enforcement; and remanded for further proceedings.

AB 51, which added § 432.6 to the California Labor Code, was enacted with the purpose of ensuring that individuals are not retaliated against for refusing to consent to the waiver of rights and procedures established in the California Fair Employment and Housing Act and the California Labor Code; and to ensure that any contract relating to those rights and procedures be entered into as a matter of voluntary consent, not coercion. Other provisions of the California Code, specifically Labor Code § 433 and Government Code § 12953, render violations of § 432.6 a misdemeanor offense and open an employer to potential civil sanctions. The district court concluded that AB 51 placed agreements to arbitrate on unequal footing with other contracts and also that AB 51 stood as an obstacle to the purposes and objectives of the Federal Arbitration Act ("FAA"). The district court preliminarily enjoined enforcement of § 432.6(a)–(c) as to arbitration agreements covered by the FAA.

---

*** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that California Labor Code § 432.6 neither conflicted with the language of § 2 of the FAA nor created a contract defense by which executed arbitration agreements could be invalidated or not enforced. A thorough review of the historical context of the FAA, its legislative history, and subsequent Supreme Court jurisprudence demonstrated that Congress was focused on the enforcement and validity of consensual written agreements to arbitrate and did not intend to preempt state laws requiring that agreements to arbitrate be voluntary. The panel held that § 432.6 did not make invalid or unenforceable any agreement to arbitrate, even if such agreement was consummated in violation of the statute. Rather, the panel noted that while mandating that employer-employee arbitration agreements be consensual, § 432.6 specifically provides that nothing in the section was intended to invalidate a written arbitration agreement that was otherwise enforceable under the FAA. The panel determined that § 432.6 applied only in the absence of an agreement to arbitrate and expressly provided for the validity and enforceability of agreements to arbitrate. The panel held that because the district court erred in concluding that § 432.6(a)–(c) were preempted by the FAA, it necessarily abused its discretion in granting Appellees a preliminary injunction.

The panel agreed, however, that the civil and criminal penalties associated with AB 51 stood as an obstacle to the purposes of the FAA and were therefore preempted. The panel held that Section § 432.6 was not preempted by the FAA because it was solely concerned with pre-agreement employer behavior, but because the accompanying enforcement mechanisms sanctioning employers for violating § 432.6 necessarily included punishing employers for entering into an agreement to arbitrate. The panel held

that a state law that incarcerates an employer for six months for entering into an arbitration agreement directly conflicts with § 2 of the FAA. Therefore, the panel held that Government Code § 12953 and Labor Code § 433 were preempted to the extent that they applied to executed arbitration agreements covered by the FAA.

Dissenting, Judge Ikuta stated that AB 51 has a disproportionate impact on arbitration agreements by making it a crime for employers to require arbitration provisions in employment contracts.  She stated that the majority abetted California's attempt to evade the FAA and the Supreme Court's caselaw by upholding this anti-arbitration law on the pretext that it barred only nonconsensual agreements.  Judge Ikuta stated that the majority's ruling conflicted with the Supreme Court's clear guidance in *Kindred Nursing Centers Ltd. Partnership v. Clark*, 137 S. Ct. 1421, 1425 (2017), which held that the FAA invalidates state laws that impede the formation of arbitration agreements.  The majority ruling also created a circuit split with sister circuits, which have held that too-clever-by-half workarounds and covert efforts to block the formation of arbitration agreements are preempted by the FAA just as much as laws that block enforcement of such agreements.

## COUNSEL

Chad A. Stegeman (argued), Deputy Attorney General; Michelle M. Mitchell, Supervising Deputy Attorney; Thomas S. Patterson, Senior Assistant Attorney General; Rob Bonta, Attorney General; Office of the Attorney General, San Francisco, California; for Defendants-Appellants.

Andrew J. Pincus (argued), Archis A. Parasharami, and Daniel E. Jones, Mayer Brown LLP, Washington, D.C.; Bruce J. Sarchet and Maurice Baskin, Littler Mendelson PC, Sacramento, California; Donald M. Falk, Mayer Brown LLP, Palo Alto, California; Erika C. Frank, California Chamber of Commerce, Sacramento, California; Steven P. Lehotsky and Jonathan Urick, U.S. Chamber Litigation Center, Washington, D.C.; for Plaintiffs-Appellees.

Cliff Palefsky and Matt Koski, McGuinn Hillsman & Palefsky, San Francisco, California, for Amicus Curiae California Employment Lawyers Association.

## OPINION

LUCERO, Circuit Judge:

The Federal Reporter is awash with descriptions of "judicial hostility" to arbitration that spurred enactment of the Federal Arbitration Act (FAA). Evolution of this "hostility" is traced not to the particular desires of individual judges but to two doctrines of English common law: ouster (which made illegal any agreement that lessened a statutory grant of judicial jurisdiction) and revocability (which allowed a party to withdraw consent to arbitrate at any point prior to the arbitrator's ruling). These two doctrines were followed for their "antiquity" rather than their "excellence or reason." *See U.S. Asphalt Ref. Co. v. Trinidad Lake Petroleum Co.*, 222 F. 1006, 1007 (S.D.N.Y. 1915). By the turn of the twentieth century, litigants, lawyers, and judges all agreed that the two doctrines should be sent hence from American jurisprudence.

This goal was achieved by enactment of the FAA, which intended "to make the contracting party live up to his agreement." H.R. Rep. No. 68-96, at 1 (1924). Following enactment of the FAA, parties could "no longer refuse to perform [their] contract when it [became] disadvantageous," ensuring that an arbitration agreement would be "placed upon the same footing as other contracts, where it belongs." *Id.* In furtherance of this congressional intent, the Court has repeatedly instructed that "the principal purpose of the FAA is to ensure that private arbitration agreements are enforced according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (cleaned up). Just as clearly, the Court has emphasized: "The first principle that underscores all of our arbitration decisions is that arbitration is strictly a matter of consent." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019) (cleaned up). "[T]he FAA does

not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989).

The jurisprudence surrounding the preemptive scope of the FAA has grown on the precedential trellis of these basic principles. Each time the Supreme Court has clarified the preemptive scope of the FAA, it has done so by ruling on the enforceability or validity of executed agreements to arbitrate, explaining that the FAA does not preempt the field of arbitration. Today we are asked to abandon the framework of FAA preemption of state rules that selectively invalidate or refuse to enforce arbitration agreements, ignore the holding of *Volt*, and nullify a California law enacted to codify what the enactors of the FAA took as a given: that arbitration is a matter of contract and agreements to arbitrate must be voluntary and consensual. As we read California Labor Code § 432.6, the state of California has chosen to assure that entry into an arbitration agreement by an employer and employee is mutually consensual and to declare that compelling an unwilling party to arbitrate is an unfair labor practice. We are asked by plaintiffs to hold that the FAA requires parties to arbitrate when but one party desires to do so. Our research leads to nothing in the statutory text of the FAA or Supreme Court precedent that authorizes or justifies such a departure from established jurisprudence, and we decline to so rule. Thus, we must reverse the judgment of the district court.

Yet operation of other provisions within the California code renders a violation of § 432.6 a misdemeanor offense and opens an employer to potential civil sanctions. The imposition of civil and criminal sanctions for the act of executing an arbitration agreement directly conflicts with the FAA and such an imposition of sanctions is indeed

preempted.  We therefore affirm the district court as to the application of Labor Code § 433 and Government Code § 12953 to arbitration agreements covered by § 1 of the FAA.

**I**

**A**

California Governor Gavin Newsom signed into law California Assembly Bill 51, 2019 Cal. Stats. Ch. 711 (AB 51), on October 10, 2019.  Section 1 of AB 51 declares that "it is the policy of this state to ensure that all persons have the full benefit of the rights, forums, and procedures established in the California Fair Employment and Housing Act . . . and the Labor Code."  AB 51.  Pursuant to this policy, AB 51 was enacted with the "purpose of . . . ensur[ing] that individuals are not retaliated against for refusing to consent to the waiver of those rights and procedures and to ensure that any contract relating to those rights and procedures be entered into as a matter of voluntary consent, not coercion."  *Id.*  Arbitration is not singled out by AB 51.  Rather, AB 51 covers a range of waivers, including non-disparagement clauses and non-disclosure agreements.

AB 51 added § 432.6 to the California Labor Code.  That section provides:

> (a) A person shall not, as a condition of employment, continued employment, or the receipt of any employment-related benefit, require any applicant for employment or any employee to waive any right, forum, or procedure for a violation of any provision of the California Fair Employment and Housing Act (Part 2.8 (commencing with Section

12900) of Division 3 of Title 2 of the Government Code) or this code, including the right to file and pursue a civil action or a complaint with, or otherwise notify, any state agency, other public prosecutor, law enforcement agency, or any court or other governmental entity of any alleged violation.

(b) An employer shall not threaten, retaliate or discriminate against, or terminate any applicant for employment or any employee because of the refusal to consent to the waiver of any right, forum, or procedure for a violation of the California Fair Employment and Housing Act or this code, including the right to file and pursue a civil action or a complaint with, or otherwise notify, any state agency, other public prosecutor, law enforcement agency, or any court or other governmental entity of any alleged violation.

(c) For purposes of this section, an agreement that requires an employee to opt out of a waiver or take any affirmative action in order to preserve their rights is deemed a condition of employment.

. . .

(f) Nothing in this section is intended to invalidate a written arbitration agreement that is otherwise enforceable under the Federal Arbitration Act (9 U.S.C. Sec. 1 et seq.).

Cal. Lab. Code § 432.6.  Its placement in Article 3 of the Labor Code brings § 432.6 under Labor Code § 433, which states that "[a]ny person violating this article is guilty of a misdemeanor."  This, in turn, makes a violation of § 432.6 "punishable by imprisonment in a county jail, not exceeding six months, or by a fine not exceeding one thousand dollars ($1,000), or both."  Cal. Lab. Code § 23.

Finally, AB 51 also added § 12953 to the California Government Code.  That section provides: "It is an unlawful employment practice for an employer to violate Section 432.6 of the Labor Code."  Cal. Gov't Code § 12953.  Other provisions within the Government Code create civil sanctions for "unlawful employment practices," including investigation by the Department of Fair Housing and Employment and potential civil litigation brought either by that Department on behalf of an aggrieved individual or, if the Department declines to initiate litigation, by the individual in a private suit.  *See* Cal. Gov't Code §§ 12960–12965.

## B

AB 51 was enacted with an effective date of January 1, 2020.  Cal. Lab. Code § 432.6(h).  On December 9, 2019, Appellees filed a complaint for declaratory and injunctive relief, seeking a declaration that AB 51 was preempted by the FAA and asking the court to preliminarily and permanently enjoin Appellants from enforcing the statute.  The same day, Appellees filed a motion for a preliminary injunction.  While the injunction motion was pending, Appellees filed a motion for a temporary restraining order, which was granted on December 30, 2019, two days before AB 51 was to take effect.

The trial court conducted a hearing on the motion for a preliminary injunction on January 10, 2020. It granted Appellees' motion for a preliminary injunction via minute order on January 31, 2020 and issued a detailed decision on February 7, 2020. After resolving issues of jurisdiction that are not contested on appeal,[1] the court turned to the merits of Appellees' preliminary injunction motion. Concluding that AB 51 placed agreements to arbitrate on unequal footing with other contracts and also that it stood as an obstacle to the purposes and objectives of the FAA, the trial court found that Appellees were likely to succeed on the merits of their claim. After determining the other injunction factors also favored Appellees, the court preliminarily enjoined Appellants from enforcing § 432.6(a)–(c) as to arbitration agreements covered by the FAA.

## II

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. "The first factor—likelihood of success on the merits—is the most important factor." *California v. Azar*, 950 F.3d 1067, 1083 (9th Cir. 2020) (en

---

[1] While the issue is not contested on appeal, we have satisfied ourselves of the district court's jurisdiction and our own. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998). The trial court correctly determined that it had subject matter jurisdiction under 28 U.S.C. § 1331. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983). We, in turn, have jurisdiction to review a grant of a preliminary injunction under 28 U.S.C. § 1292(a)(1).

banc) (quotations omitted). "If a movant fails to establish likelihood of success on the merits, we need not consider the other factors." *Id.* "We review a district court's decision to grant or deny a preliminary injunction for abuse of discretion." *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020). We review the legal issues underlying the grant de novo "because a district court would necessarily abuse its discretion if it based its ruling on an erroneous view of law." *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 753 (9th Cir. 2018) (quotation omitted).

### III

### A

The Supremacy Clause states:

> This Constitution, and the laws of the United States . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.

U.S. Const. art. VI, cl. 2. It "provides a rule of decision for determining whether federal or state law applies in a particular situation." *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (quotation omitted). If Congress "enacts a law that imposes restrictions or confers rights on private actors" and "a state law confers rights or imposes restrictions that conflict with the federal law," then "the federal law takes precedence and the state law is preempted." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1480 (2018). The Supreme Court has identified three types of preemption: "conflict, express, and field." *Id.* (quotations omitted). Of these, only conflict preemption is relevant to the present

appeal.  Express preemption occurs when Congress passes a statute that explicitly preempts state law.  *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203 (1983).  Field preemption occurs when "Congress has legislated so comprehensively that it has left no room for supplementary state legislation." *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986).  The Supreme Court has explained that neither express nor field preemption is applicable to the FAA.  *See Volt*, 489 U.S. at 477 ("The FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration.").

Conflict preemption manifests in two ways: "impossibility" preemption and "obstacle" preemption. Impossibility preemption occurs when "it is impossible . . . to comply with both state and federal requirements" and obstacle preemption occurs when a "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 761 (9th Cir. 2015) (quotation omitted).

### B

At issue in this appeal is the preemptive scope of 9 U.S.C. § 2, the "primary substantive provision of the [FAA]." *Concepcion*, 563 U.S. at 339 (quotation omitted). It provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part

thereof, or an agreement in writing to submit
to arbitration an existing controversy arising
out of such a contract, transaction, or refusal,
shall be valid, irrevocable, and enforceable,
save upon such grounds as exist at law or in
equity for the revocation of any contract.

Conflict preemption analysis under the FAA follows the
basic structure outlined above, but the sheer volume of FAA
preemption jurisprudence has created an FAA-specific gloss
to the doctrines of impossibility and obstacle preemption.

To understand how impossibility preemption operates in
FAA cases, a brief discussion of the statute's "saving clause"
is required.   The last clause of § 2 provides that "an
agreement in writing" to arbitrate a dispute "shall be valid,
irrevocable, and enforceable, *save upon such grounds as
exist at law or in equity for the revocation of any contract*."
9 U.S.C. § 2 (emphasis added).  The saving clause "permits
agreements to arbitrate to be invalidated by generally
applicable contract defenses, such as fraud, duress, or
unconscionability, but not by defenses that apply only to
arbitration or that derive their meaning from the fact that an
agreement to arbitrate is at issue." *Blair v. Rent-A-Ctr., Inc.*,
928 F.3d 819, 825 (9th Cir. 2019) (quoting *Concepcion*,
563 U.S. at 339).  To fall within the saving clause and avoid
preemption, a rule must "put arbitration agreements on an
equal plane with other contracts." *Kindred Nursing Centers
Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1427 (2017).

It is this "equal plane" or "equal footing" principle that
guides impossibility preemption under the FAA.  If a state-
law contract defense treats arbitration agreements less
favorably than any other contract—that is, if the defense
allows for an agreement to arbitrate to be invalidated or not

enforced in circumstances where another contract would be enforced or deemed valid—that contract defense does not fall within the saving clause.  Outside the protective ambit of the saving clause, a contract defense that provides for the invalidation or nonenforcement of an arbitration agreement is in direct conflict with the FAA's mandate; it is thus impossible for the contract defense and the FAA to coexist, and the FAA must prevail.  Importantly, the "equal footing principle" applies the same to a contract defense that "discriminat[es] on its face against arbitration" as it does to "any rule that covertly accomplishes the same objective by disfavoring contracts that (oh so coincidentally) have the defining features of arbitration agreements."  *Id.* at 1426.

If a state rule places arbitration agreements on equal footing with other contracts and thus falls within the saving clause, it may still be preempted by "the ordinary working of conflict pre-emption principles," including obstacle preemption.  *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000).  Under obstacle preemption, a state statute or rule is preempted by the FAA if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Concepcion*, 563 U.S. at 352 (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941)).  "The principal purpose of the FAA is to ensure that private arbitration agreements are enforced according to their terms."  *Id.* at 344 (cleaned up).  Rules that selectively interfere with the enforcement of arbitration agreements are therefore preempted by the FAA.  A state rule may also stand as an obstacle to the FAA through "subtle methods" that "interfer[e] with fundamental attributes of arbitration." *Lamps Plus*, 139 S. Ct. at 1418 (quoting *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1622 (2018)).

With this understanding of preemption under the FAA, we turn to the principal question before us:  Is § 432.6 of the California Labor Code preempted by § 2 of the FAA?**2**

## C

### 1

Preemption analysis begins with the text of the two statutes.  The FAA and § 432.6 do not conflict because, by its terms, § 2 of the FAA simply does not apply to § 432.6. The California law does not create a contract defense that allows for the invalidation or nonenforcement of an agreement to arbitrate, nor does it discriminate on its face against the enforcement of arbitration agreements.  Indeed, the only reference in § 432.6 to executed arbitration agreements covered by the FAA is a provision that protects their enforcement.  *See* Cal. Lab. Code § 432.6(f).  That § 432.6 cannot be used to invalidate, revoke, or fail to enforce an arbitration agreement removes it from saving clause jurisprudence.  Supreme Court and Ninth Circuit caselaw uniformly applies saving clause analysis in instances where a party relies on a contract defense or state rule to invalidate or not enforce an existing agreement to arbitrate.  *See, e.g.*, *Epic Sys. Corp.*, 138 S. Ct. at 1619–20; *Kindred Nursing*, 137 S. Ct. at 1426; *Concepcion*, 563 U.S. at 337–38; *Preston v. Ferrer*, 552 U.S. 346, 349–51, (2008); *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 683–84 (1996); *Perry v. Thomas*, 482 U.S. 483, 484–86 (1987); *Blair*, 928 F.3d at 823–24; *Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425, 430–33 (9th Cir. 2015).  Unlike this line

---

**2** We separately consider the FAA's preemptive effect on Government Code § 12953 and Labor Code § 433, which we conclude do conflict with § 2.  *See* section III.D, *infra*.

of cases, the present appeal does not concern a state rule that provides a contract defense through which an agreement to arbitrate may be invalidated. *See Concepcion*, 563 U.S. at 339. Nor does it "prohibit[] outright the arbitration of a particular type of claim." *Id.* at 341. Therefore, it is not "impossible" for § 432.6 and the FAA to coexist. *See Ryan*, 786 F.3d at 761.

Concluding the contrary, the trial court relied largely on *Kindred Nursing* and *Casarotto*. *See Chamber of Com. of United States v. Becerra*, 438 F. Supp. 3d 1078, 1097–98 (E.D. Cal. 2020). It reasoned that by prohibiting an employer from forcing a prospective or current employee to "waive any right, forum, or procedure for a violation of any provision of the California Fair Employment and Housing Act," *id.* at 1087 (quoting Cal. Lab. Code § 432.6), § 432.6 "embod[ied] . . . a legal rule hinging on the primary characteristic of an arbitration agreement, and placing arbitration agreements in a class apart from any contract." *Id.* at 1098 (quotations omitted) (citing *Kindred Nursing*, 137 S. Ct. at 1427; *Casarotto*, 517 U.S. at 688). This reasoning would be persuasive if either (1) § 432.6 regulated the enforcement or validity of arbitration agreements or (2) *Kindred Nursing* or *Casarotto* held that regulation of pre-agreement conduct was preempted by the FAA. But neither condition is met.

As discussed, § 432.6 does not make invalid or unenforceable any agreement to arbitrate, even if such agreement is consummated in violation of the statute. Rather, while mandating that employer-employee arbitration agreements be consensual, it specifically provides that "[n]othing in this section is intended to invalidate a written arbitration agreement that is otherwise enforceable under the Federal Arbitration Act." Cal. Lab. Code § 432.6(f).

Placing a pre-agreement condition on the waiver of "any right, forum, or procedure" does not undermine the validity or enforceability of an arbitration agreement—its effects are aimed entirely at conduct that takes place prior to the existence of any such agreement.  Both *Kindred Nursing* and *Casarotto* analyzed state rules that rendered an executed agreement to arbitrate invalid or unenforceable.  Neither preempted a rule that regulated pre-agreement behavior.

*Kindred Nursing* considered the "clear-statement rule" announced by the Kentucky Supreme Court.  137 S. Ct. at 1426.  At issue in that case were two arbitration agreements executed by individuals who were authorized through powers of attorney to act on behalf of others.  *Id.* at 1424–25.  At least one authorization was broad enough for it to be "impossible to say that entering into an arbitration agreement was not covered."  *Id.* at 1426 (quotation omitted and alteration adopted).  Despite this, the Kentucky Supreme Court invalidated the arbitration agreements.  It explained that "the jury guarantee is the sole right the [Kentucky] Constitution declares 'sacred' and 'inviolate,'" and, as such, "an agent could deprive her principal of an 'adjudication by judge or jury' only if the power of attorney 'expressly so provided.'"  *Id.* at 1426 (alteration adopted) (quoting *Extendicare Homes, Inc. v. Whisman*, 478 S.W.3d 306, 328–29 (Ky. 2015)).  Reversing the Kentucky Supreme Court, *Kindred Nursing* explained that Kentucky's "clear-statement rule" was preempted by the FAA because it "relied on the uniqueness of an agreement to arbitrate as its basis," and "failed to put arbitration agreements on an equal plane with other contracts."  *Id.* at 1426, 1426–27 (cleaned up).  In so holding, the Court rejected an argument that the FAA does not preempt state rules that govern only the formation of arbitration agreements:

> By its terms, then, the Act cares not only about the "enforce[ment]" of arbitration agreements, but also about their initial "valid[ity]"—that is, about what it takes to enter into them. Or said otherwise: A rule selectively finding arbitration contracts invalid because improperly formed fares no better under the Act than a rule selectively refusing to enforce those agreements once properly made.

*Id.* at 1428.

It is this passage that the district court and Appellees contend controls the outcome of the present appeal. They focus on the language "what it takes to enter into them" for the proposition that the FAA preempts regulation of pre-agreement behavior. *See Becerra*, 438 F. Supp. 3d at 1096. However, reading this passage in context, the language was not intended to break new jurisprudential ground. The Court itself explained that its conclusion "falls well within the confines of (and goes no further than) present well-established law." 137 S. Ct. at 1429 (quotation and citation omitted). As in all past cases, the court was concerned with "rule[s] selectively finding arbitration contracts invalid because improperly formed." In other words, the Court only addressed pre-agreement behavior to the extent it provided the basis to invalidate *already executed* contracts. It is simply not persuasive to argue, as Appellees do, that the Supreme Court dramatically expanded the preemptive scope of the FAA in seven words of dicta—especially considering this dicta is nestled within language that explicitly references executed arbitration agreements ("the Act cares not only about the 'enforce[ment]' of arbitration agreements, but also about their initial 'valid[ity]'" and "[a] rule selectively

finding arbitration contracts invalid because improperly formed fares no better under the Act than a rule selectively refusing to enforce those agreements once properly made," *id.* at 1428). Reading this passage in the broader context of *Kindred Nursing* also has the advantage of better according with the text of the FAA, which mandates that a written agreement to arbitrate "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. In contrast, Appellees' assertion that *Kindred Nursing* recognizes FAA preemption for instances in which there is no agreement to arbitrate at issue would expand the scope of the FAA far beyond its text. Appellees' argument amounts to asserting field preemption, which stands in direct contradiction to the Court's holding in *Volt*. *Volt*, 489 U.S. at 477 ("The FAA . . . does [not] reflect a congressional intent to occupy the entire field of arbitration."). Absent binding precedent demanding a contrary conclusion, we decline to depart from the clear text of the FAA.

For similar reasons, *Casarotto* does not support Appellees' case. *Casarotto* considered a Montana statute that "declare[d] an arbitration clause unenforceable unless notice that the contract is subject to arbitration is typed in underlined capital letters on the first page of the contract." 517 U.S at 683 (quotation omitted and alterations adopted). The Court held that the Montana statute was preempted by the FAA, concluding it "directly conflict[ed] with § 2 of the FAA because the State's law conditions the enforceability of arbitration agreements on compliance with a special notice requirement not applicable to contracts generally." *Id.* at 687. *Casarotto* is an example of straightforward conflict preemption analysis of a state rule that declared an executed arbitration agreement invalid. It does not support the proposition that the FAA preempts state regulation of pre-

agreement behavior in the absence of an executed arbitration agreement.

California Labor Code § 432.6 neither conflicts with the language of § 2 of the FAA nor creates a contract defense by which executed arbitration agreements may be invalidated or not enforced. Under the "impossibility" preemption framework, § 432.6 is not preempted by the FAA.

**2**

Even though § 432.6 does not directly conflict with the FAA, it may still be preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67. The first step in the obstacle preemption analysis is to establish what precisely were the purposes and objectives of Congress in enacting the FAA. A thorough review of the historical context of the FAA, its legislative history, and subsequent Supreme Court jurisprudence demonstrates that Congress was focused on the enforcement and validity of consensual written agreements to arbitrate and did not intend to preempt state laws requiring that agreements to arbitrate be voluntary.

Congress passed the FAA "to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219–20 (1985). Prior to the FAA, "courts considered agreements to arbitrate unenforceable executory contracts" and breaching an agreement to arbitrate generally "resulted in nominal legal damages." Kristen M. Blankley, *Impact Preemption: A New Theory of Federal Arbitration Act Preemption*, 67 Fla. L. Rev. 711, 719 (2015). The refusal to enforce arbitration agreements stemmed from American adoption of the English common law doctrines of ouster and

revocability.   *See* David Horton, *Federal Arbitration Act Preemption, Purposivism, and State Public Policy*, 101 Geo. L.J. 1217, 1225–26 (2013).  The former declared illegal any agreement that reduced statutory judicial jurisdiction and the latter allowed a party to withdraw their consent to arbitrate at any time prior to the arbitrator's ruling.   *See id.*; *see also Home Ins. Co. of New York v. Morse*, 87 U.S. 445, 451 (1874) ("[A]greements in advance to oust the courts of the jurisdiction conferred by law are illegal and void.").  In the decades preceding the passage of the FAA, ouster and revocability had become unloved children of English common law.  *See* Horton, *supra*, at 1225–26 ("By the dawn of the twentieth century, the ouster and revocability doctrines were condemned by judges, lawyers, and business groups as anomalous and unjust." (cleaned up)); *see also Meacham v. Jamestown, F. & C.R. Co.*, 211 N.Y. 346, 354 (1914) (Cardozo, J., concurring) ("It is true that some judges have expressed the belief that parties ought to be free to contract about such matters as they please.  In this state the law has long been settled to the contrary.").

The context of the FAA's passage was thus the widespread opposition to English common law doctrines that mandated that consensual written arbitration agreements were invalid and unenforceable.  Securing the validity and enforceability of arbitration agreements was precisely what Congress intended to achieve through the FAA.  The House Report accompanying its passage declared:  "The purpose of this bill is to make valid and enforcible [sic] agreements for arbitration contained in contracts involving interstate commerce or within the jurisdiction [of] admiralty, or which may be the subject of litigation in the Federal courts."  H.R. Rep. No. 68-96, at 1 (1924).  The Senate Report agreed, describing the purpose of the statute as "[t]o make valid and enforceable written provisions or agreements for arbitration

of disputes arising out of contracts, maritime transactions, or commerce among the States or Territories or with foreign nations." S. Rep. No. 68-536, at 1 (1924). The House Report also makes explicit that the FAA was laser-focused on ensuring that people who agreed to arbitrate a dispute were held to their word:

> Arbitration agreements are purely matters of contract, and the effect of the bill is simply to make the contracting party live up to his agreement. He can no longer refuse to perform his contract when it becomes disadvantageous to him. An arbitration agreement is placed upon the same footing as other contracts, where it belongs.

H.R. Rep. No. 68-96, at 1.

In the almost-century since it became law, the Supreme Court has expounded on the congressional purpose animating the FAA, explaining that its passage signified "a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The Court has reiterated this principle time and again over the years, but each time, without fail, it has noted that the FAA enshrined the enforceability and validity of consensual, written agreements to arbitrate disputes. *See Concepcion*, 563 U.S. at 344 ("The principal purpose of the FAA is to ensure that private arbitration agreements are enforced according to their terms.") (cleaned up); *see also, e.g.*, *Epic Sys. Corp.*, 138 S. Ct. at 1621; *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013); *Volt*, 489 U.S. at 478; *Dean Witter Reynolds*, 470 U.S. at 219. The

statute, legislative history, and caselaw thus all agree that the purpose of the FAA is to ensure that written, consensual agreements to arbitrate disputes are valid and enforceable as a matter of contract.

In light of Congress' clear purpose to ensure the validity and enforcement of consensual arbitration agreements according to their terms, it is difficult to see how § 432.6, which in no way affects the validity and enforceability of such agreements, could stand as an obstacle to the FAA. Irrespective of AB 51's enforcement mechanisms, an employee may attempt to void an arbitration agreement that he was compelled to enter as a condition of employment on the basis that it was not voluntary.  If a court were to find that such a lack of voluntariness is a generally applicable contract defense that does not specifically target agreements to arbitrate, the arbitration agreement may be voided in accordance with saving clause jurisprudence.  This specific question is not before us, and we do not answer it.

The district court focused its obstacle preemption analysis on the potential civil and criminal liability AB 51 imposes on employers who include a compulsory arbitration clause as a condition of employment. *See Becerra*, 438 F. Supp. 3d at 1099–1100.  Appellees dedicate a substantial portion of their brief to the same concern.  As explained more fully below, we agree that the civil and criminal penalties associated with AB 51 stand as an obstacle to the purposes of the FAA and are therefore preempted.  Outside of their concerns over potential civil and criminal liability, Appellees' sole remaining argument for obstacle preemption is that § 432.6 interferes with their "federally protected right to enter into arbitration agreements with their workers."  Of course, nothing in § 2 grants an employer the right to force arbitration agreements on unwilling employees.  The only

"federally protected right" conferred by the FAA is the right to have consensual agreements to arbitrate enforced according to their terms.  Because nothing in § 432.6 interferes with this right, it does not stand as an obstacle to the purposes and objectives of the FAA.

## D

The dissent expounds on the expansive nature of FAA preemption and details the perceived invidious intent of the California Legislature.[3]  Yet for all its colorful language, it does not meaningfully engage with the question at the core of this case:  Does the text of the FAA or the precedent interpreting it expand the preemptive scope of the statute to situations in which there is no agreement to arbitrate at issue?  As explained above, the answer to this question is "no."  That answer undergirds our resolution of this case and undermines the entirety of the dissent's argument.

Attempting to escape the conclusion that this case falls outside of existing precedent[4] delineating the preemptive scope of the FAA, the dissent asserts that we "misread[] the clear import" of *Kindred Nursing*, which it claims "confirmed the rule that the FAA invalidates state laws that

---

[3] Contrary to the dissent's implications, it is unremarkable that the California Legislature would be cognizant of relevant federal law and make efforts to draft a statute that avoided preemption.  Indeed, one could argue that writing and passing laws that are not preempted is a core duty of a state legislature.

[4] Our dissenting colleague asserts that "we don't need to wait until the next Supreme Court reversal" to hold that AB 51 is preempted by the FAA.  To the contrary, basic principles of federalism caution us against expanding the preemptive scope of a federal statute absent explicit instruction from the high court.

impede the formation of arbitration agreements." A review of the cited portion of *Kindred Nursing* reveals no such broad holding. Rather, the Supreme Court is explicit that the FAA preempts a state rule that "selectively find[s] arbitration contracts invalid because improperly formed." *Kindred Nursing*, 137 S. Ct. at 1428. It was not happenstance, as the dissent asserts, that *Kindred Nursing* evaluated a state rule that declared invalid certain *executed* arbitration agreements. Instead, the existence of an agreement to arbitrate was crucial to its holding. It was the very fact that the Kentucky rule invalidated an executed agreement to arbitrate that ran afoul of the FAA's mandate that "an arbitration agreement . . . be treated as 'valid, irrevocable, and enforceable.'" *Id.* (quoting 9 U.S.C. § 2). The dissent is correct to explain that *Kindred Nursing* emphasized that the FAA preempts rules affecting the initial validity of arbitration agreements, but that is not at issue in this case. As explained above, we are presented with a state rule that applies only in the absence of an agreement to arbitrate and that *expressly provides* for the validity and enforceability of agreements to arbitrate. The text of the FAA does not preempt such a rule, and, despite the dissent's attempt to shoehorn its argument into the holding of *Kindred Nursing*, nor does the governing caselaw.

## E

The regulation of pre-agreement employer behavior in § 432.6 does not run afoul of the FAA, but the civil and criminal sanctions attached to a violation of that section do. They stand as an obstacle to the "liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24, and are therefore preempted by the FAA.

As mentioned, § 433 of the California Labor Code makes any violation of that article, including § 432.6, a misdemeanor offense. Labor Code § 23 makes any misdemeanor within the Labor Code "punishable by imprisonment in a county jail, not exceeding six months, or by a fine not exceeding one thousand dollars ($1,000), or both." Cal. Lab. Code § 23. Additionally, AB 51 added § 12953 to the California Government Code, which makes a violation of Labor Code § 432.6 "an unlawful employment practice." This, in turn, subjects an individual or entity who violates § 432.6 to civil sanctions including state investigation and private litigation. *See* Cal. Gov't Code §§ 12960–12965.

Regulation of pre-agreement conduct in § 432.6 differs significantly from these enforcement mechanisms. Section § 432.6 is not preempted by the FAA because it is solely concerned with pre-agreement employer behavior, but the accompanying enforcement mechanisms that sanction employers for violating § 432.6 necessarily include punishing employers for entering into an agreement to arbitrate.[5] A state law that incarcerates an employer for six months for entering into an arbitration agreement "directly conflicts with § 2 of the FAA." *Casarotto*, 517 U.S. at 687. An arbitration agreement cannot simultaneously be "valid" under federal law and grounds for a criminal conviction under state law. The potential civil sanctions provided by Government Code § 12953 are also preempted. We

---

[5] Section 432.6(a) forbids employers from requiring an arbitration agreement as a condition of employment regardless of whether an arbitration agreement is executed. Similarly, an employer violates § 432.6(b) by threatening to retaliate against an employee for refusing to sign an arbitration agreement, even if the employee subsequently agrees to sign.

conclude that, much like a state may not "prohibit[] outright the arbitration of a particular type of claim," *Kindred Nursing*, 137 S. Ct. at 1426 (quotation omitted), it also may not impose civil or criminal sanctions on individuals or entities for the act of executing an arbitration agreement. Therefore, we hold that Government Code § 12953 and Labor Code § 433 are preempted to the extent that they apply to executed arbitration agreements covered by the FAA.[6]

## IV

Appellees have not established that they are likely to succeed on the merits of their complaint for declaratory and injunctive relief, and, therefore, "we need not consider the other [preliminary injunction] factors." *Azar*, 950 F.3d at 1083. Because the district court erred in concluding that § 432.6(a)–(c) were preempted by the FAA it "necessarily abuse[d] its discretion" in granting Appellees a preliminary injunction. *adidas Am.*, 890 F.3d at 753 (quotation omitted). Accordingly, the preliminary injunction is vacated, and the case is remanded for further proceedings consistent with this opinion.

---

[6] Appellees assert that enjoining application of § 433 to agreements covered by the FAA would amount to a "judicial rewrite of [California's] statutory scheme." Not so. It is well settled that "when confronting a constitutional flaw in a statute, we try to limit the solution to the problem" by "for example, . . . enjoin[ing] only the unconstitutional applications of a statute while leaving other applications in force . . . ." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006); *see also Volt*, 489 U.S. at 477 (a state law that violates the FAA is "pre-empted to the extent that it actually conflicts with federal law—that is, to the extent that it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (quotation omitted)).

## V

We **REVERSE IN PART** the trial court's conclusion that AB 51 is preempted by the FAA, **VACATE** the preliminary injunction, and **REMAND** for further proceedings consistent with this opinion. The parties shall bear their own costs on appeal.

---

IKUTA, Circuit Judge, dissenting:

Like a classic clown bop bag, no matter how many times California is smacked down for violating the Federal Arbitration Act (FAA), the state bounces back with even more creative methods to sidestep the FAA. This time, California has enacted AB 51, which has a disproportionate impact on arbitration agreements by making it a crime for employers to require arbitration provisions in employment contracts. Cal. Lab. Code §§ 432.6(a)–(c), 433; Cal. Gov't Code § 12953. And today the majority abets California's attempt to evade the FAA and the Supreme Court's caselaw by upholding this anti-arbitration law on the pretext that it bars only nonconsensual agreements. The majority's ruling conflicts with the Supreme Court's clear guidance in *Kindred Nursing Centers Ltd. Partnership v. Clark*, 137 S. Ct. 1421, 1428–29 (2017), and creates a circuit split with the First and Fourth Circuits. Because AB 51 is a blatant attack on arbitration agreements, contrary to both the FAA and longstanding Supreme Court precedent, I dissent.

## I

By its terms, the FAA ensures that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

revocation of any contract." 9 U.S.C. § 2. The FAA preempts any state law that stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). The Supreme Court has long recognized the FAA's broad purpose: it declares "a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), and embodies a "national policy favoring arbitration," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)). When faced with a principle of "state law, whether of legislative or judicial origin," that burdens arbitration and that "takes its meaning precisely from the fact that a contract to arbitrate is at issue," we must strike it down as preempted by the FAA. *Perry v. Thomas*, 482 U.S. 483, 492 n. 9 (1987). And even when a state law generally applies to a range of agreements, the FAA preempts the law if it "interferes with fundamental attributes of arbitration" and obstructs the purpose of the FAA. *Concepcion*, 563 U.S. at 344. As the Supreme Court has explained, "[a]lthough § 2's saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." *Id.* at 343.

AB 51 is just such a state law that obstructs the purpose of the FAA. The history of AB 51 reveals it was the culmination of a many-year effort by the California legislature to prevent employers from requiring an arbitration provision as a condition of employment. California has long known that the FAA preempted laws that made arbitration agreements unenforceable, because the

Supreme Court has so often struck down its anti-arbitration legislation or judge-made rules.[1]

In light of these rulings, the California legislature took a different approach to anti-arbitration legislation. In 2015, it passed Assembly Bill 465, which banned employers from requiring arbitration agreements as a condition of employment and rendered unenforceable any offending contract. Text of AB 465, 2015–16 Cal. Leg., Reg. Sess. (2015).[2] California Governor Jerry Brown vetoed this bill on the ground that such a "blanket ban" had been "consistently struck down in other states as violating the Federal Arbitration Act" and noted that the California Supreme Court and United States Supreme Court had invalidated similar legislation. Governor's Veto Message for AB 465, 2015–16 Cal. Leg., Reg. Sess. (2015); *see, e.g.*, *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 530–31 (2012) (per curiam); *Perry*, 482 U.S. at 484, 489; *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984). That same year, the Supreme Court overruled a California court's interpretation of an arbitration agreement, because it did not place arbitration contracts "on equal footing with all other

---

[1] *See, e.g.*, *Concepcion*, 563 U.S. at 352 (holding that the FAA preempted the California rule that contract provisions disallowing classwide arbitration are unconscionable); *Preston v. Ferrer*, 552 U.S. 346, 349–50 (2008) (holding that the FAA preempted a California law giving a state agency primary jurisdiction over a dispute involving the California Talent Agency Act despite the parties' agreement to arbitrate such disputes); *Perry*, 482 U.S. at 484, 489 (holding that the FAA preempted a state statute permitting litigation of wage collection actions despite the existence of any private agreement to arbitrate).

[2] The relevant legislative history referenced here is publicly available on the California Legislative Information website: https://leginfo.legislature.ca.gov/.

contracts." *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 58–59 (2015) (quoting *Buckeye*, 546 U.S. at 443).  This decision was followed by yet another defeat of state anti-arbitration legislation when a California court held that the FAA preempted another California statute, which had made agreements to arbitrate certain state civil rights claims unenforceable.  *See Saheli v. White Mem'l Med. Ctr.*, 21 Cal. App. 5th 308, 323 (2018).

Undeterred, the state legislature tried again in 2018 and passed AB 3080, which prohibited an employer from requiring an employee to waive a judicial forum as a condition of employment.  Text of AB 3080, 2017–18 Cal. Leg., Reg. Sess. (2018).  Governor Brown exercised his veto power again, explaining that AB 3080 "plainly violates federal law."  Governor's Veto Message for AB 3080, 2017–18 Cal. Leg., Reg. Sess. (2018).  Governor Brown cited the "clear" direction from the United States Supreme Court in *Imburgia*, 136 S. Ct. at 468, and *Kindred Nursing*, 137 S. Ct. at 1428.

Twice-vetoed but still undeterred, the California Assembly introduced AB 51 in December 2018.  This bill, now before us, took the same approach as the vetoed AB 3080:  instead of barring enforcement of arbitration agreements offered as a condition of employment, it instead penalized the formation or attempted formation of such agreements.  Text of AB 51, 2019–20 Cal. Leg., Reg. Sess. (2019); *see also* Cal. Lab. Code §§ 432.6(a)–(c), 433.  While it prohibited an employer from requiring an applicant for employment to enter an arbitration agreement, it provided that an executed arbitration agreement was nevertheless enforceable.  *See* Cal. Lab. Code § 432.6(a)–(b), (f).

Accompanying legislative reports reveal the purpose of AB 51 and explain the oddity of penalizing the formation of

arbitration agreements while permitting their enforcement. The California Senate Judiciary Committee report on AB 51 recognized that "there is little doubt that, if enacted, the bill would be challenged in court and there is some chance, under the current composition of the U.S. Supreme Court, that it would be found preempted." Senate Judiciary Committee Report at 7, 2019–20 Cal. Leg., Reg. Sess. (2019). These reports acknowledge candidly that, in light of such anticipated scrutiny, "AB 51 seeks to sidestep the preemption issue." Senate Labor, Public Employment and Retirement Committee Report at 4, 2019–20 Cal. Leg., Reg. Sess. (2019). The reports assured legislators that AB 51 "successfully navigates around" Supreme Court precedent and "avoids preemption by applying only to the condition in which an arbitration agreement is made, as opposed to banning arbitration itself." Senate Judiciary Committee Report at 8; Assembly Labor and Employment Committee Report at 3, 2019–20 Cal. Leg., Reg. Sess. (2019). AB 51's author noted that this contrivance gave the legislature "a reasoned case" that the bill would not be preempted, given that "[t]here has not been a preemption case in the absence of an arbitration agreement." Senate Judiciary Committee Report at 7; Assembly Labor and Employment Committee Report at 3. Another key component of the "reasoned case" for avoiding preemption, according to the legislators, was that AB 51 prevented "forced arbitration," which was not the "result of mutual consent" but was imposed on employees "against their will." Assembly Judiciary Committee Report at 5, 2019–20 Cal. Leg., Reg. Sess. (2019); Senate Judiciary Committee Report at 4. According to the legislators, this rationale was consistent with Supreme Court cases stressing the fundamental rule that arbitration agreements be consensual. Senate Judiciary Committee Report at 8 (citing *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010)).

California's new governor, Gavin Newsom, signed the bill into law, even though AB 51 was identical in many respects to vetoed AB 3080.  *See id.* at 9.

II

A

As this history suggests, the California legislature developed AB 51 with the focused intent of opposing arbitration and sidestepping the FAA's preemptive sweep by penalizing the formation, or attempted formation, of disfavored arbitration agreements but not interfering with the enforcement of such agreements.

Specifically, under Section 432.6 of the California Labor Code, an employer "shall not, as a condition of employment . . . require any applicant for employment or any employee to waive any right, forum, or procedure for a violation of the California Fair Employment and Housing Act [(FEHA)]" or the California Labor Code, "including the right to file and pursue a civil action or a complaint with . . . any court." Cal. Lab. Code § 432.6(a).  Thus, employers may not require employees to sign a standard employment contract that includes an arbitration provision, even if the contract includes a voluntary opt-out clause.  *See* Cal. Lab. Code § 432.6(c).  Moreover, an employer cannot refuse to hire a prospective employee who declines to enter into an arbitration agreement or otherwise "threaten, retaliate or discriminate against" such an employee.  Cal. Lab. Code § 432.6(b).    Violating  Section 432.6  amounts  to  an "unlawful employment practice" for which aggrieved employees and the state may bring civil suits against employers.   *See*  Cal. Gov't  Code  §§ 12953, 12960. Violating Section 432.6 also constitutes a criminal offense. *See* Cal. Lab. Code § 433.  Should the employee sign such

an employment contract, however, the arbitration agreement it contains is perfectly enforceable because Section 432.6(f) provides that "[n]othing in this section is intended to invalidate a written arbitration agreement that is otherwise enforceable under the Federal Arbitration Act."  Cal. Lab. Code § 432.6(f).

In short, AB 51 criminalizes offering employees an agreement to arbitrate, even though the arbitration provision itself is lawful and enforceable once the agreement is executed.  The question is, does this too-clever-by-half workaround actually escape preemption?  The majority says it does, but this is clearly wrong:  under Supreme Court precedent, Section 432.6 is entirely preempted by the FAA.

B

Although the Supreme Court has not addressed California's specific legislative gimmick—criminalizing contract formation if it includes an arbitration provision—this is not surprising, given that California designed the gimmick to sidestep any existing Supreme Court precedents. But even so, the Supreme Court has made it clear that the FAA preempts this type of workaround, which is but the latest of the "great variety of devices and formulas" disfavoring arbitration.  *See Concepcion*, 563 U.S. at 342 (cleaned up).

As a threshold matter, California's circumvention exemplifies the exact sort of "'hostility to arbitration' that led Congress to enact the FAA."  *Kindred Nursing*, 137 S. Ct. at 1428 (quoting *Concepcion*, 563 U.S. at 339); *see also Buckeye*, 546 U.S. at 443.  The Supreme Court has made clear that the FAA displaces not only state laws that discriminate on their face against arbitration, but also those that "covertly accomplish[] the same objective," *Kindred*

*Nursing*, 137 S. Ct. at 1426.  Indeed, even if state laws are "generally applicable," the FAA preempts them where "in practice they have a 'disproportionate impact' on arbitration." *Mortensen v. Bresnan Commc'ns, LLC*, 722 F.3d 1151, 1159 (9th Cir. 2013) (quoting *Concepcion*, 563 U.S. at 341–342).  AB 51 is the poster child for covertly discriminating against arbitration agreements and enacting a scheme that disproportionately burdens arbitration.

More specifically, Supreme Court precedent makes clear that the FAA preempts laws like AB 51 that burden the formation of arbitration agreements.  Long ago, the Supreme Court held that the FAA preempted a Montana law making an arbitration clause unenforceable unless it had a specific type of notification on the first page of the contract.  *See Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681 (1996).  In *Casarotto*, the state supreme court reasoned—much like California here—that this notice requirement did not "undermine the goals and policies of the FAA" because the "notice requirement did not preclude arbitration agreements altogether" but instead ensured that arbitration agreements had to be entered "knowingly." *Id.* at 685 (quoting *Casarotto v. Lombardi*, 268 Mont. 369, 381 (1994)).  The Court rejected this reasoning. *Id.* at 688.

*Kindred Nursing* has now confirmed the rule that the FAA invalidates state laws that impede the formation of arbitration agreements.  In *Kindred Nursing*, the Court struck down the Kentucky Supreme Court's "clear-statement rule" which provided that a person holding a power of attorney for a family member could not enter into an arbitration agreement for that family member, unless the power of attorney gave the person express authority to do so.  137 S. Ct. at 1425–26.  The Supreme Court held that this clear-statement rule—which imposed a burden only on contract

formation—violated the FAA, because it "singles out arbitration agreements for disfavored treatment." *Id.* at 1425.

The majority attempts to distinguish *Kindred Nursing* on the ground that it addresses "pre-agreement behavior to the extent it provided the basis to invalidate *already executed* contracts." Majority at 20. This misreads the clear import of the case. In *Kindred Nursing*, the parties opposing arbitration, like the majority here, advanced an argument "based on the distinction between contract formation and contract enforcement." 137 S. Ct. at 1428. According to their argument, Kentucky's clear-statement rule "affects only contract-formation, because it bars agents without explicit authority from entering into arbitration agreements." *Id.* The opponents argued (like the majority here) that "the FAA has no application to contract formation issues" and claimed that the "FAA's statutory framework applies only *after* a court has determined that a valid arbitration agreement was formed." *Id.* (cleaned up). Although the opponents acknowledged that the FAA "requires a State to enforce all arbitration agreements (save on generally applicable grounds) once they have come into being," they claimed (like the majority here) that "States have free rein to decide—irrespective of the FAA's equal-footing principle— whether such contracts are validly created in the first instance." *Id.*

The Court expressly rejected these arguments. *Id.* "By its terms," the Court explained, the FAA "cares not only about the enforcement of arbitration agreements, but also about their initial validity—that is, about what it takes to enter into them." *Id.* (cleaned up). Because the Kentucky rule "specially impeded the ability of attorneys-in-fact to enter into arbitration agreements" and "thus flouted the

FAA's command to place those agreements on an equal footing with all other contracts," the FAA preempted Kentucky's rule. *Id.* at 1429. This common-sense conclusion that state law cannot impede parties' abilities to enter arbitration agreements fit "well within the confines of (and goes no further than) present well-established law." *Id.* (quoting *Imburgia*, 577 U.S. at 58). To hold otherwise, the Court explained, would render the FAA "helpless to prevent even the most blatant discrimination against arbitration." *Id.* In reaching this conclusion, the Court put no weight on the fact that the arbitration agreement at issue in *Kindred Nursing* had already been executed.[3] Rather, *Kindred Nursing*'s bottom line is that a state cannot single out arbitration agreements by imposing special limiting rules at the formation stage. *Id* at 1428–29.

*Kindred Nursing*'s holding that the FAA preempts rules that burden the formation of an arbitration agreement, *see* 137 S. Ct. at 1428–29, applies equally to AB 51, which is intentionally designed to burden and penalize an employer's formation, or attempted formation, of an arbitration agreement with employees. *See* Cal. Lab. Code § 432.6(a)–(c); *see also* Cal. Lab. Code § 433; Cal. Gov't Code § 12953. In upholding AB 51, which "specially impede[s] the ability of [employers] to enter into arbitration agreements" and

---

[3] The majority's argument that "the existence of an agreement to arbitrate was crucial" to *Kindred Nursing*, Majority at 27, is baseless; instead, the Supreme Court focused on the FAA's applicability to contract formation, including state rules that barred specified individuals from entering into arbitration agreements. *See, e.g.*, 137 S. Ct. at 1428–29 (noting that if the FAA did not apply to rules impeding contract formation, a state would be free to hold that everyone was incompetent to enter into an arbitration agreement, which would render the FAA meaningless). AB 51 is such a rule impeding contract formation, as it criminalizes employers' attempts to enter into an arbitration agreement.

"thus flout[s] the FAA's command to place those agreements on an equal footing with all other contracts," *Kindred Nursing*, 137 S. Ct. at 1429, the majority directly conflicts with the rule stated in *Kindred Nursing*.

In addition to conflicting with *Kindred Nursing*, the majority's ruling today creates a split with two of our sister circuits. Long before *Kindred Nursing* reached its common-sense conclusion, our sister circuits prevented state efforts like California's that attempted to sidestep the FAA while disfavoring arbitration. The First Circuit held that the FAA preempted Massachusetts regulations that prohibited securities firms from requiring clients to agree to arbitration "as a nonnegotiable condition precedent to account relationships." *Sec. Indus. Ass'n v. Connolly*, 883 F.2d 1114, 1117, 1125 (1st Cir. 1989). Even if this regulation did not invalidate the arbitration agreements themselves, the First Circuit rejected as "too clever by half" the state's attempt to regulate parties' conduct instead of the parties' agreements. *Id.* at 1122–23.[4] Applying well-established preemption principles, *Connolly* reasoned that "[s]tate law need not clash head on with a federal enactment in order to be preempted." *Id. Connolly* explained that the threatened loss of a business license for offering clients a standard agreement including an arbitration provision was "an obstacle of greater proportions even than the chance that, in

---

[4] This held true even though the regulations would lead to enforcement even in the absence of any executed arbitration agreement. The regulations proscribed "[r]equiring . . . that a customer . . . execute" a non-negotiable arbitration provision, prohibited "[r]equesting . . . that a customer . . . execute" an arbitration provision without disclosing that it cannot be non-negotiable, and even prohibited "[r]equesting . . . that a customer . . . execute" an arbitration provision without disclosing its effect. *Connolly*, 883 F.2d at 1125 (quoting 950 Mass. Code Regs. § 12.204(G)(1)(a)–(c) (1988)).

a given dispute, an arbitration agreement might be declared void." *Id.* at 1124. Thus, the regulations were preempted as "at odds with the policy which infuses the FAA." *Id.*

The Fourth Circuit similarly held that the FAA preempted a Virginia law that made it unlawful for automobile manufacturers and distributors to fail to include a particular clause in franchise agreements. *Saturn Distrib. Corp. v. Williams*, 905 F.2d 719, 724 (4th Cir. 1990). That clause would provide that any contract provision that "denies access to the procedures, forums, or remedies" provided by state law "shall be deemed to be modified to conform to such laws or regulations." *Id.* (quoting Va. Code Ann. § 46.1-550.5:27). As interpreted by the court, the statute forbade "only nonnegotiable arbitration provisions and not negotiable arbitration agreements." *Id.* Analogizing to *Connolly*, the Fourth Circuit held that the statute conflicted with the FAA because it "essentially prohibited nonnegotiable arbitration agreements." *Id.*

AB 51's contrived approach closely tracks the impermissible workarounds disapproved of by the First and Fourth Circuits. *See Connolly*, 883 F.2d at 1122; *Saturn*, 905 F.2d at 724. Without even acknowledging the existence of this conflicting authority, and contrary to our rule that we may not create a direct conflict with other circuits "[a]bsent a strong reason to do so," *see United States v. Cuevas-Lopez*, 934 F.3d 1056, 1067 (9th Cir. 2019) (quoting *United States v. Chavez-Vernaza*, 844 F.2d 1368, 1374 (9th Cir. 1987)), the majority silently creates a circuit split that will require en banc review or Supreme Court intervention to resolve, *see*

*Hart v. Massanari*, 266 F.3d 1155, 1169, 1171 (9th Cir. 2001); *see also* Fed. R. App. P. 35(b)(1)(A)–(B).[5]

Taking into account these precedents and the broad preemptive scope of the FAA, it is clear that the FAA preempts AB 51, which prohibits employers from entering into arbitration agreements with their employees as a condition of employment.  Under *Kindred Nursing*, such a rule is invalid, 137 S. Ct. at 1428–29, and AB 51 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Concepcion*, 563 U.S. at 352 (quoting *Hines*, 312 U.S. at 67).

### III

The contrary arguments raised by California and the majority are not persuasive.

### A

First, California and the majority claim that AB 51 does not pose an obstacle to the FAA because it is simply a prohibition against so-called "forced arbitration."  Under this theory, AB 51 seeks to protect employees from involuntary contracts forced upon them by employers.  According to the majority, California enacted AB 51 "to assure that entry into an arbitration agreement by an employer and employee is mutually consensual and to declare that compelling an

---

[5] Although the majority claims the dissent "does not meaningfully engage" with the core question whether the preemptive scope of the FAA extends "to situations in which there is no agreement to arbitrate at issue," Majority at 26, it is the majority that dodges this core question by ignoring our sister circuits' rulings that the FAA does indeed preempt state laws that impede parties from freely entering into arbitration agreements.

unwilling party to arbitrate is an unfair labor practice." Majority at 8.  These guardrails protecting employees from unwanted arbitration provisions do not interfere with the FAA, the majority reasons, because nothing in 9 U.S.C. § 2 "grants an employer the right to force arbitration agreements on unwilling employees."  Majority at 25.  The majority's reasoning parrots the assurances offered by California legislators that AB 51 is consistent with the Supreme Court's instruction that "consent is the touchstone of arbitration agreements" and that AB 51 merely ensures "employees may *choose* to waive their rights in order to get or keep a job, but they are never *forced* to."  Senate Judiciary Committee Report at 8.

There is no merit to this argument, which misunderstands basic principles of California contract law, Supreme Court caselaw regarding consent in arbitration cases, and AB 51 itself.  Contrary to the majority, a contract may be "consensual," as that term is used in contract law, even if one party accepts unfavorable terms due to unequal bargaining power.

It is a basic principle of contract law that a contract is not enforceable unless there is mutual, voluntary consent.  *See, e.g.*, Cal. Civ. Code §§ 1565, 1567; *Monster Energy Co. v. Schechter*, 7 Cal. 5th 781, 789 (2019); *Morrill v. Nightingale*, 93 Cal. 452, 455 (1892).  It has long been established that parties to a contract are generally deemed to have consented to all the terms of a contract they sign, even if they have not read it.  *See, e.g.*, *Marin Storage & Trucking Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1049 (2001); *Greve v. Taft Realty Co.*, 101 Cal. App. 343, 351–52 (1929).  This is true even if the contract at issue is an adhesion contract, defined by California courts as "a standardized contract, which, imposed and drafted by the

party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it," *Neal v. State Farm Ins. Cos.*, 188 Cal. App. 2d 690, 694 (1961).   Despite unequal bargaining power, "a contract of adhesion is fully enforceable according to its terms unless certain other factors are present," such as when a provision "does not fall within the reasonable expectations of the weaker or 'adhering' party" or when a provision "is unduly oppressive or unconscionable." *Graham v. Scissor-Tail, Inc*., 28 Cal. 3d 807, 819–20 (1981) (per curiam) (cleaned up).   And although adhesion contracts do not fit the "classical model of 'free' contracting by parties of equal or near-equal bargaining strength," they are an "inevitable fact of life for all citizens." *Id.* at 817–818.

Of course, mandatory arbitration provisions in employment contracts of adhesion are not enforceable if the provisions are procedurally and substantively unconscionable, or otherwise unenforceable under generally applicable contract rules. *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 125–26 (2019). Unequal bargaining power, "economic pressure," "sharp practices," and "surprise" can help establish procedural unconscionability.   *Id.* at 126–29 (cleaned up).   Moreover, if a party is forced to sign a contract by threats or physical coercion, for instance, the contract would lack mutual consent and be unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract."   9 U.S.C.  § 2.   Therefore, there is no risk of employers forcing arbitration agreements on unwilling employees, as those terms are understood in California contract law.   Majority at 8, 25.   AB 51 does nothing to change these basic principles.

In short, under California law, an employee "consents" to an employment contract by entering into it, even if the

contract was a product of unequal bargaining power and even if it contains terms (such as an arbitration provision) that the employee dislikes, so long as the terms are not invalid due to unconscionability or other generally applicable contract principles.  An employee's preference for litigating disputes with an employer, without more, does not make an arbitration agreement nonconsensual.

Because the parties to a contract are deemed to consent to its terms, the "basic precept that arbitration 'is a matter of consent, not coercion,'" means only that courts must "ensure that 'private arbitration agreements are enforced according to their terms'" even in the face of state laws imposing different requirements on the contracting parties.  *Stolt-Nielsen*, 559 U.S. at 681–682 (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478–79 (1989)).  Thus, this fundamental rule of consent means only that "the FAA pre-empts state laws which 'require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration,'" *Volt*, 489 U.S. at 478 (quoting *Southland*, 465 U.S. at 10), and also preempts any similar judge-made rules of contract construction or public policy that seek "ends other than the intent of the parties," such as a rule "preferring interpretations that favor the public interest," *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1417 (2019).  Therefore, contrary to California and the majority, the concept of "consent" in the Supreme Court's arbitration decisions is not violated when there is economic pressure to enter into an agreement with disadvantageous terms, or when the party to the contract with lesser bargaining power is subjectively unhappy with those terms.

This principle applies equally to employment contracts and employment-related lawsuits.  In upholding a contract

provision requiring arbitration of Age Discrimination in Employment Act claims, the Supreme Court rejected the argument that the agreement was invalid due to the "unequal bargaining power between employers and employees." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 32–33 (1991). The Court stated that "[m]ere inequality in bargaining power" is not sufficient to refuse to enforce an arbitration agreement in the employment context, because "arbitration agreements are enforceable 'save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Id.* at 33 (quoting 9 U.S.C. § 2).

Accordingly, there is no support for California's description of AB 51 as simply an assurance that employees will not be the victims of forced arbitration or be compelled to arbitrate claims against their wills. Majority at 8, 25. For the same reason, there is no support for the majority's view that AB 51 merely takes away an employer's ability "to force arbitration agreements on unwilling employees." Majority at 25. Rather, AB 51 disproportionately targets and burdens employers offering arbitration agreements as a condition of employment, which "does not place arbitration contracts on equal footing with all other contracts" and therefore fails to give "due regard to the federal policy favoring arbitration." *Imburgia*, 577 U.S. at 58 (cleaned up). Therefore, even if AB 51 applies to a handful of other agreements in addition to arbitration agreements, its interference with parties' abilities to agree to arbitration stands as an obstacle to the "'accomplishment and execution of the full purposes and objectives of Congress,'" and "thus creates a scheme inconsistent with the FAA." *Concepcion*, 563 U.S. at 344, 352 (quoting *Hines*, 312 U.S. at 67).

B

Second, the majority attempts to rescue its opinion by ruling that AB 51's civil and criminal penalties under Section 12953 of the California Government Code and Section 433 of the California Labor Code "are preempted to the extent that they apply to executed arbitration agreements covered by the FAA." Majority at 29. The majority acknowledges that the FAA preempts any rule that imposes liability for conduct resulting in an executed arbitration agreement. Majority at 28–29. In case the effect of this novel holding is not clear, it means that if the employer offers an arbitration agreement to the prospective employee as a condition of employment, and the prospective employee executes the agreement, the employer may not be held civilly or criminally liable. But if the prospective employee refuses to sign, then the FAA does not preempt civil and criminal liability for the employer under AB 51's provisions. In other words, the majority holds that if the employer successfully "forced" employees "into arbitration against their will," Senate Judiciary Committee Report at 4, the employer is safe, but if the employer's efforts fail, the employer is a criminal.

Despite holding that AB 51 is preempted in part, the majority's unusual bifurcated approach still conflicts with the FAA. Most important, it does not "place arbitration agreements upon the same footing as other contracts." *Southland*, 465 U.S. at 16, n.11 (cleaned up). Until AB 51, neither the California legislature nor any state court has held that a person can be prosecuted for attempting to enter into a legal and enforceable agreement. But that is the import of the majority's ruling today. Because, as the majority acknowledges, an executed arbitration agreement is valid and enforceable (except on grounds that are generally

applicable to all contracts), the employer's conduct proscribed by Section 432.6—offering an employment agreement that requires arbitration—results in a contract that is both lawful and enforceable. But the majority upholds Section 432.6 and its associated sanctions so long as they are not applied to conduct leading to executed arbitration agreements. This holding means that an employer's attempt to enter into an arbitration agreement with employees is unlawful, but a completed attempt is lawful. This tortuous ruling is analogous to holding that a statute can make it unlawful for a dealer to attempt to sell illegal drugs, but if the dealer succeeds in completing the drug transaction, the dealer cannot be prosecuted. Needless to say, such a bizarre approach does not apply to any other contracts in California. As such, it is preempted by the FAA for disfavoring arbitration contracts and obstructing the purpose and objectives of the FAA.

IV

In sum, AB 51's transparent effort to sidestep the FAA in order to disfavor arbitration agreements in employment contracts is meritless. By upholding this maneuver, the majority conflicts with *Kindred Nursing*, which held that the FAA invalidates state laws that impede the formation of arbitration agreements. 137 S. Ct. at 1425. The majority also silently splits from our sister circuits, which have held that too-clever-by-half workarounds and covert efforts to block the formation of arbitration agreements are preempted by the FAA just as much as laws that block enforcement of such agreements. So we don't need to wait until the next Supreme Court reversal to know that we must apply those principles here. The majority's bifurcated, half-hearted, and circuit-splitting approach to invalidating AB 51 makes little sense, except to the extent it aims at abetting California in

disfavoring arbitration.  Because the appellants here have
demonstrated a likelihood of success on the merits and the
district court correctly determined that the remaining
preliminary injunction factors supported injunctive relief, I
would affirm the district court.  I therefore dissent.